Ralph GILBERT, Gloria Gilbert, Michelle Torgerson, Edwin Torgerson, Melda Bittorf, Beverly Cox, William Cox, Kimberly Miles, Clea Fockler, John Fockler, Linda Eckert, Scott Eckert, William Strine, Kenny Jasinski, Dennis Jasinski, Kathryn Jasinski, Joseph Jasinski, Patricia Unverzagt, Megan Jacobs, Barbara Unverzagt, Donna Parr, Jeff Fodel, Wendy Fodel, Jennifer Jasinski, John Jasinski, Judy Queitzsch, Jean Fry, Rick McSherry, John Freese, Donna Lynn Freese, Jeff Van Voorhis, Susan Lee Fox, Terrence Fancher and Donna Fancher, Appellants

v.

SYNAGRO CENTRAL, LLC, Synagro Mid–Atlantic, George Phillips, Hilltop Farms and Steve Troyer, Appellees.

Superior Court of Pennsylvania.

Argued Dec. 10, 2013.

Filed April 15, 2014.

John Kotsatos, Bethlehem, for appellants.

Curtis N. Stambaugh, Harrisburg, for Phillips and Hilltop Farms, appellees.

Neil A. Slenker, York and James B. Slaughter, Washington, D.C., for Synagro Central and Synagro Mid–Atlantic, appellees.

BEFORE: DONOHUE, OTT and PLATT *, JJ.

OPINION BY DONOHUE, J.:

Appellants, Ralph Gilbert, Gloria Gilbert, Michelle Torgerson, Edwin Torgerson, Melda Bittorf, Beverly Cox, William Cox, Kimberly Miles, Clea Fockler, John Fockler, Linda Eckert, Scott Eckert, William Strine, Kenny Jasinski, Dennis Jasinski, Kathryn Jasinski, Joseph Jasinski, Patricia Unverzagt, Megan Jacobs, Barbara Unverzagt, Donna Parr, Jeff Fodel, Wendy Fodel, Jennifer Jasinski, John Jasinski, Judy Queitzsch, Jean Fry, Rick McSherry, John Freese, Donna Lynn Freese, Jeff Van Voorhis, Susan Lee Fox, Terrence Fancher, and Donna Fancher (collectively, the "Residents"), appeal from the trial court's order granting summary judgment in favor of Synagro Central, LLC and Synagro Mid–Atlantic (together "Synagro"), George Phillips ("Phillips"), Hilltop Farms ("Hilltop"), and Steve Troyer ("Troyer") (collectively, the "Farm Parties"). Because we conclude, *inter alia,* that issues of material fact remain with respect to whether the use of biosolids in this case is a "normal agricultural operation" under the Right To Farm Act, 3 P.S. §§ 951–957 (the "RTFA"), we reverse the trial court's order and remand the case for further proceedings consistent with this decision.

The Residents all own or reside at properties located adjacent to a 220–acre farm in New Freedom, York County, Pennsylvania (the "Farm"), owned by Phillips since 1986. On this farmland, Phillips owns and operates Hilltop Farms, a farm business. Since 2003, Troyer has leased portions of the farmland from Phillips, and has planted and harvested crops, including corn and soybeans. Synagro contracts with municipalities to recycle and transport biosolids for land applications, and in 2005 obtained a permit from the Pennsylvania Department of Environmental Protection (the "PaDEP") to provide "land application and long-term storage services" of biosolids to Phillips at Hilltop Farm.

According to the Residents, biosolids (sometimes referred to as "sewage sludge"), is a "viscous, semi-solid mixture of bacteria, virus-laden organic matter, toxic metals, synthetic organic chemicals, and settled solids removed from domestic and industrial waste water at sewage treatment plants." Amended Complaint, 7/23/2010, at ¶ 53. Sewage sludge contains "prescription drug products and their biologically active metabolites, synthetic chemicals, and other industrial chemicals, waste, and toxic runoff," and the sludge treatment process often raises the pH to a level where it "is irritating to skin, nose, throat and lungs, and can cause rashes and burns." *Id.* at ¶¶ 55–56.

Beginning in March 2006 and continuing until April 2009, approximately 11,635 wet tons of biosolids were applied to fields at the Farm, including as follows:

- Over three days in March 2006, approximately 1,113 tons of biosolids were applied on three fields (nos. 7, 9, and 11) totaling approximately 67 acres (an overall average of 16 and

---

* Retired Senior Judge assigned to the Superior Court.

one half tons per acre, or about seven pounds per square yard);

- In May 2006, approximately 437 tons were applied on two fields (nos. 1 and 3) totaling approximately 48 acres over two days (an overall average of about nine and one half tons per acre);

- Over three days in September 2006, approximately 1,100 tons were applied on two fields (nos. 2 and 5) totaling approximately 40 acres (an average of more than 27 tons per acre, or about 11 pounds per square yard);

- In late March through mid-April 2007, approximately 1,504 tons were applied on four fields (nos. 7, 9, 11, and 12) totaling approximately 74 acres (an average of about 20 tons per acre);

- In late April and May 2007, approximately 1.301 tons were applied to one field (no. 14) of approximately 54 acres (an average of about 24 tons per acre);

- Over three days in July 2007, approximately 1,774 tons of biosolids were applied on six fields (nos. 1, 3, 6, 8, 10, and 13) totaling approximately 100 acres (an average of less than 18 tons per acre, or about 7.5 pounds per square yard);

- In January and February 2008, approximately 1,593 tons were applied to six fields (nos. 6, 7, 8, 9, 10, and 11) totaling approximately 110 acres (an average of about 13 and one half tons per acre);

- In October 2008, approximately 424 tons were applied on three fields (nos. 1, 4, and 8) totaling approxi-

mately 59 acres (an average of about 13 and one half tons per acre); and

- In March and April 2009, approximately 1,430 tons were applied to eight fields (nos. 2, 3, 5, 9, and 11–14) totaling approximately 120 acres (an average of 12 tons per acre).

Farm Parties' Summary Judgment Exhibits J and K. The biosolids were spread over the surface of the fields and were not immediately tilled or plowed into the soil. *Id.* at Exhibit F. According to the Residents, as soon as the spreading of biosolids at the Farm began, they immediately noticed extremely offensive odors, "typically smelling like a herd of dead, rotting deer." Amended Complaint, 7/23/2010, at ¶ 86.

The application of the biosolids was monitored by the PaDEP and the York County Solid Waste Authority, and three notices of violation were issued, although none involved odors emanating from the Farm.[1] Farm Parties' Summary Judgment Exhibits at Exhibits O, P, and Q. In October 2009, Synagro notified the PaDEP that it was suspending the use of biosolids at the Farm. *Id.* at Exhibit S.

On July 3, 2008 and July 10, 2008, the Residents filed two similar three-count complaints. On December 1, 2008, the trial court consolidated the two actions. On July 23, 2010, with leave of court the Residents filed a joint Amended Complaint, which sets forth three counts. In Count I, the Residents allege that the biosolids activities of the Farm Parties have resulted in offensive conditions and created a health hazard for those living on the adjoining properties, in the nature of a private nuisance. In Count II, the Residents allege that the Farm Parties have

---

1. Two of the violations, received in March 2006 and April 2009, alleged that biosolids had been spread beyond designated target areas. The Farm Parties contend that they took immediate corrective actions in response. The third notice was issued in June 2007 for tilling a field too soon after application of biosolids.

acted negligently because the Farm Parties failed in their duty to properly handle and dispose of the biosolids in a manner to avoid the potential harm to the Residents. In Count III, the Residents allege that biosolids activities of the Farm Parties constitute a trespass onto their land. The Residents seek injunctive relief, compensatory and punitive damages, and counsel fees and costs.

On July 25, 2011, the Farm Parties filed a Joint Motion for Summary Judgment, and the Residents filed a response in opposition. On October 14, 2011, the trial court denied the motion for summary judgment, stating as follows:

> Because RTFA does not specifically mention sewer sludge or biosolids, it is not clear, as a matter of law, that the application of biosolids is a 'normal agricultural operation' under the protection of the RTFA. Even though each side refutes the other's position whether the application of sewer sludge/biosolids is a normal agricultural operation, neither side has presented any supporting evidence.
>
> &ast; &ast; &ast;
>
> Because [the Farm Parties] have not provided any supporting evidence to show what constitutes 'normal agricultural operations' or that application of biosolids is a 'normal agricultural operation,' the Motion for Summary Judgment is denied.

Trial Court Opinion, 10/14/2011, at 8–9.

On July 2, 2012, after discovery, the Farm Parties filed a second Joint Motion for Summary Judgment, and the Residents again filed a response in opposition. In an opinion and order dated December 28, 2012, the trial court granted the motion for summary judgment, concluding that the Residents' nuisance count was barred by the statute of repose set forth in section 954(a) of the RTFA and that the Residents had failed to plead a *prima facie* claim for negligence or trespass.

This timely appeal followed, in which the Residents present the following two issues for our consideration and determination:

1. Whether the trial court erred in granting summary judgment and holding that the Residents' nuisance and negligence claims were barred by the one-year limitation in the [RTFA].

2. Whether the trial court erred in granting summary judgment and holding that the Residents failed to plead *prima facie* claims for negligence and trespass.

Residents' Brief at 2. The following parties have submitted *amicus curiae* briefs, all in support of the position of the Farm Parties: the PaDEP, the Office of the Attorney General of the Commonwealth of Pennsylvania and the Pennsylvania Department of Agriculture, the City of Philadelphia, the Pennsylvania Municipal Authorities Association and the Allegheny County Sanitary Authority, the Pennsylvania Farm Bureau, the PennAg Industries Association, and the Mid–Atlantic Biosolids Association, the Pennsylvania Water Environment Association, and the Pennsylvania Septage Management Association.

Our standard of review with respect to a trial court's decision to grant or deny a motion for summary judgment is as follows:

> A reviewing court may disturb the order of the trial court only where it is established that the court committed an error of law or abused its discretion. As with all questions of law, our review is plenary.
>
> In evaluating the trial court's decision to enter summary judgment, we focus on the legal standard articulated in the summary judgment rule. Pa.R.C.P.

1035.2. The rule states that where there is no genuine issue of material fact and the moving party is entitled to relief as a matter of law, summary judgment may be entered. Where the non-moving party bears the burden of proof on an issue, he may not merely rely on his pleadings or answers in order to survive summary judgment. Failure of a non-moving party to adduce sufficient evidence on an issue essential to his case and on which it bears the burden of proof establishes the entitlement of the moving party to judgment as a matter of law. Lastly, we will view the record in the light most favorable to the non-moving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party.

*JP Morgan Chase Bank, N.A. v. Murray*, 63 A.3d 1258, 1261–62 (Pa.Super.2013) (quoting *Murphy v. Duquesne Univ. of the Holy Ghost*, 565 Pa. 571, 590, 777 A.2d 418, 429 (2001)).

For their first issue on appeal, the Residents contend that the trial court erred in granting summary judgment in favor of the Farm Parties with regard to whether section 954(a) of the RTFA bars the Residents' nuisance claim.[2] Our legislature passed the RTFA in 1982 in an effort to "protect agricultural operations from the encroachment of nonagricultural uses and the nuisance suits which inevitably follow." *Horne v. Haladay*, 728 A.2d 954, 956 (Pa.Super.1999). Section 951 provides the following legislative policy statement:

### § 951. Legislative policy

It is the declared policy of the Commonwealth to conserve and protect and encourage the development and improvement of its agricultural land for the production of food and other agricultural products. When nonagricultural land uses extend into agricultural areas, agricultural operations often become the subject of nuisance suits and ordinances. As a result, agricultural operations are sometimes forced to cease operations. Many others are discouraged from making investments in farm improvements. It is the purpose of this act to reduce the loss to the Commonwealth of its agricultural resources by limiting the circumstances under which agricultural operations may be the subject matter of nuisance suits and ordinances.

3 P.S. § 951.

The limitations on nuisance actions are set forth in the statute of repose in section 954 of the RTFA, and require a plaintiff either to file the nuisance action within one year of the inception of the agricultural operation or a substantial change in that operation, as provided in subsection 954(a), or to base their nuisance claim on a violation of a federal, state or local statute or regulation, as provided in subsection 954(b).

### § 954. Limitation on public nuisances

**(a) No nuisance action shall be brought against an agricultural operation which has lawfully been in operation for one year or more prior to the date of bringing such action, where the conditions or circumstances complained of as constituting the basis for the nuisance action have existed substantially unchanged since the established date of operation and are normal agricultural operations, or if the**

---

**2.** The trial court also ruled that section 954(a) bars the Residents' negligence claim because the facts that support the negligence claim mirror those that support the nuisance claim.

Trial Court Opinion, 12/28/2012, at 24–28. We will discuss the dismissal of the Residents' nuisance claim herein below.

physical facilities of such agricultural operations are substantially expanded or substantially altered and the expanded or substantially altered facility has either: (1) been in operation for one year or more prior to the date of bringing such action, or (2) been addressed in a nutrient management plan approved prior to the commencement of such expanded or altered operation pursuant to section 6 of the act of May 20, 1993 (P.L. 12, No. 6), known as the Nutrient Management Act, and is otherwise in compliance therewith: Provided, however, [t]hat nothing herein shall in any way restrict or impede the authority of this State from protecting the public health, safety and welfare or the authority of a municipality to enforce State law.

(b) The provisions of this section shall not affect or defeat the right of any person, firm or corporation to recover damages for any injuries or damages sustained by them on account of any agricultural operation or any portion of an agricultural operation which is conducted in violation of any Federal, State or local statute or governmental regulation which applies to that agricultural operation or portion thereof.

3 P.S. § 954 (emphasis added).

The parties agree that only the bolded portion of subsection 954(a) is applicable in this case, as neither side contends that the physical facilities at the Farm have been substantially expanded or altered. In the trial court, the Residents argued that the three notices of regulatory violations (mentioned herein above) implicated subsection 954(b), thereby negating application of the statute of repose here. In its opinion granting summary judgment, however, the trial court ruled that subsection 954(b) did not apply in this case because the Residents did not allege in the Amended Complaint that any of their alleged injuries were the result of these violations. Trial Court Opinion, 12/28/2012, at 20–21. The Residents have not appealed this determination.

By its express terms, the statute of repose set forth in subsection 954(a) applies to bar a nuisance action only if three requirements are met. First, the agricultural operation at issue must have an established date of operation at least one year prior to the filing of the lawsuit. Second, the conditions or circumstances constituting the basis of the nuisance action must have existed substantially unchanged since the established date of operation. And third, the conditions or circumstances constituting the basis of the nuisance action must be a "normal agricultural operation," as that term is defined in 3 P.S. § 952.[3]

With respect to the first requirement, the trial court agreed with the Residents that the "agricultural operation" at issue

---

**3.** The Dissent contends that whether the Farm Parties' use of biosolids constitutes a "normal agricultural operation" is an issue beyond the scope of this Court's purview in deciding this appeal, since whether the trial court properly applied subsection 954(a)'s statute of repose must be determined based only on the identity of the parties, the commencement date of the application of biosolids, and the filing dates of the Residents' complaints. Dissenting Opinion at 53.

We note that neither the trial court, the Farm Parties, nor any of the *amicus curiae* have advocated such a position before this Court.

To the contrary, all plainly agree that the statute of repose in subsection 954(a) applies only to protect "normal agricultural operations" against nuisance suits filed beyond the one-year deadline. *See, e.g.,* Farm Parties' Brief at 19 ("the statute expressly protects 'normal agricultural operations' "). As a result, a determination of whether the Farm Parties' use of biosolids in this case was a "normal agricultural operation," as that phrase is used in section 954(a) of the RTFA, was unquestionably an issue before the trial court and, hence, likewise an issue for this Court to decide on appeal.

here is that conducted at the Farm and that its "established date of operation" is 1986 when Phillips purchased the property. Trial Court Opinion, 12/28/2012, at 18–19. The Farm Parties question why the "established date of operation" should be set at the date of Phillips' acquisition of the farmland in 1986, since the land had been used for farming for many years prior to this date. Farm Parties' Brief at 28–32. The Farm Parties do not contend, however, that determination of this issue is necessary in this context, since whether the "established date of operation" is 1986 or some earlier point in time, in either event the Residents' lawsuit was not filed until 2008, well beyond the one-year requirement in subsection 954(a).

■ Before addressing the second and third requirements for application of subsection 954(a), we must determine what precisely constitutes the "the conditions or circumstances complained of as constituting the basis for the nuisance action." The Residents contend that this phrase refers to the odors and health effects resulting from the use of biosolids at the Farm, while the Farm Parties argue instead that the phrase connotes an "objective, operational change" in the agricultural operations at the Farm. Residents' Brief at 27; Farm Parties' Brief at 34. In resolving this dispute, we note that the goal and purpose of statutory interpretation is to ascertain legislative intent and give it effect, and that the plain language of the statute is, as a general rule, the best indicator of that intent. 1 Pa.C.S.A. § 1921(a); *Mohamed v. Com., Dept. of Transp., Bureau of Motor Vehicles*, 615 Pa. 6, 18, 40 A.3d 1186, 1193 (2012); *Mercury Trucking, Inc. v. Pa. PUC*, 618 Pa. 175, 192–96, 55 A.3d 1056, 1067–68 (2012).

In our view, neither of the proposed interpretations adequately captures the legislature's intent here. The Residents'

exclusive focus on the effects of the nuisance ignores that the "conditions and circumstances" at issue must constitute the "basis for the nuisance action." Likewise, nowhere in the relevant language is there any reference limiting the scope of the subsection to "operational changes."

Our Supreme Court elucidated the basis for a nuisance action in *Kramer v. Pittsburgh Coal Co.*, 341 Pa. 379, 380, 19 A.2d 362, 363 (1941):

> In legal phraseology, the term 'nuisance' is applied to that class of wrongs that arise from the unreasonable, unwarrantable, or unlawful use by a person of his own property, real or personal, or from his own improper, indecent, or unlawful personal conduct, working an obstruction or injury to a right of another, or of the public, and producing such material annoyance, inconvenience, discomfort or hurt that the law will presume a consequent damage. The distinction between trespass and nuisance consists in the former being a direct infringement of one's right of property, while, in the later, the infringement is the result of an act which is not wrongful in itself, but only in the consequences which may flow from it.

*Id.* at 380, 19 A.2d at 363 (citations and internal quotation marks omitted).

■ Accordingly, to sustain a nuisance action, a plaintiff must allege both (1) a use of property or conduct by a property owner that (2) results in material annoyance, inconvenience, or discomfort to another person or to the public. As a result, the phrase "conditions or circumstances complained of as constituting the basis for the nuisance action," must refer to the Farm Parties' application of biosolids at the Farm, as "complained of" in the Residents' Amended Complaint, that has resulted in foul odors and other harmful effects on the Residents.

With this definition in mind, we turn to the second requirement for application of subsection 954(a)—whether the "conditions or circumstances complained of as constituting the basis of the nuisance action" have existed substantially unchanged since the established date of operation. The trial court ruled that organic fertilizers had been used at the Farm since at least 1986, and that because biosolids are just another form of organic fertilizer, no substantial change had occurred. Trial Court Opinion, 12/28/2012, at 20. In our view, this was error, since, as just established, the "conditions or circumstances complained of as constituting the basis of the nuisance action" refers not just to the use of an organic fertilizer at the Farm, but rather to the use of an organic fertilizer *that resulted in extremely foul odors and health effects.* The basis for the Residents' nuisance claim is not merely that the Farm Parties' changed the type of fertilizer used at the farm, but rather than the change in fertilizers resulting in severe nuisance conditions.

Substantial evidence in the record establishes a genuine issue of material fact with respect to whether the switch to biosolids in 2006 constituted a substantial change. Numerous Residents testified that the odors experienced on their properties in 2006 and thereafter were extremely offensive and noxious, smelled like dead animals, and was so bad that on many occasions they could not leave their homes. For example, one Resident indicated that the smell was such that "you couldn't even go outside" and that it "smelled like death." Scott Eckert Dep. at 36–37. The Residents also testified that they had long been familiar with the odors from animal manures and had never objected to these smells. T. Fancher Dep. at 22; M. Torgerson Dep. at 93–94; J. Freese Dep. at 48 ("I enjoy the smell of manure. I think it is the most down-to-earth country smell that you could smell."). According to the Residents, the Farm Parties' use of biosolids created odors that were far worse than comparable odors from animal manures previously used at the farm. T. Fancher Dep. at 35–36 (biosolid use "changed the way we lived" and was far worse than animal manures); S. Fox Dep. at 112 (biosolids had a "nauseating, repulsive stench" far worse than cow manure); R. McSherry Dep. at 28–29 (animal manure has a quick smell that soon leaves you, but biosolids "was a lot stronger odor, and it stayed constantly").

■ For these reasons, we conclude that the certified record indicates that a material issue of fact exists with respect to whether the Farm Parties' use of biosolids at the Farm constituted a "substantial change" from prior operations. We nevertheless conclude, however, that the Farm Parties satisfied the second requirement for application of the RTFA's statute of repose, since the alleged substantial change occurred more than one year before the Residents filed their lawsuits in this case. The certified record plainly establishes that the Farm Parties began to apply biosolids in large quantities at the farm in March 2006, more than two years prior to the filing of the Residents' two lawsuits on July 3, 2008 and July 10, 2008. A substantial change does not eliminate subsection 954(a)'s one-year statute of repose entirely, but rather merely resets it, permitting the filing of a nuisance action within one year from the date of the substantial change. *Horne,* 728 A.2d at 956. Accordingly, even if the Residents could prove at trial that the Farm Parties' use of biosolids constituted a substantial change, their lawsuits would still not satisfy the timeliness requirements under subsection

954(a).[4]

The Residents offer two arguments in opposition to this conclusion, neither of which we find to be persuasive. First, the Residents contend that no language in subsection 954(a) indicates that the one-year time period resets after a substantial change, and that as a result after a substantial change occurs, the RTFA no longer bars nuisance actions. Residents' Brief at 33. In *Horne,* however, this Court decided to the contrary. In that case, the agricultural operation (a poultry business) began in November 1993, the defendant constructed a decomposition house in August 1994, and the appellant filed suit in November 1995. *Horne,* 728 A.2d at 956. We ruled that subsection 954(a) barred appellant's lawsuit even if construction of the decomposition house constituted a substantial change, as suit was not filed until more than one year after its completion. *Id.*

Moreover, we agree with the Farm Parties that the Residents' proposed interpretation of subsection 954(a) is inconsistent with legislative intent. Section 951 of the RTFA sets forth a clear legislative policy to "reduce the loss to the Commonwealth of its agricultural resources by limiting the circumstances under which agricultural operations may be the subject matter of nuisance suits and ordinances." 3 P.S. § 951. The Residents' interpretation, pursuant to which the statute of repose specifically designed to accomplish this legislative mandate is eliminated after any substantial change resulting in a nuisance, fails to accomplish this fundamental legislative goal.

Second, the Residents argue that even if the one-year time period resets after a substantial change, the Farm Parties' application of a large quantity of biosolids in July 2007 constituted a second substantial change. Residents' Brief at 37. According to the Residents, the Farm Parties applied 1.8 million pounds of biosolids over a weekend in July 2007, and the extremely hot temperatures exacerbated the intensity of the odors. *Id.* An increase only in the extent of the nuisance conditions, however, cannot constitute a substantial change, since the use or conduct that formed the basis for the Residents' nuisance claims—namely the application of biosolids—did not change at all. The RTFA's statute of repose would be rendered entirely ineffectual if plaintiffs could continue to restart the one-year time period by pointing to increases over time in their perception of the degree of the offensive conditions.

The third requirement under the RTFA's statute of repose in subsection 954(a) is that the practice in question must qualify as a "normal agricultural operation." The RTFA defines "normal agricultural operation" as follows:

> **"Normal agricultural operation."** The activities, practices, equipment and procedures that farmers adopt, use or engage in the production and preparation for market of poultry, livestock and their products and in the production, harvesting and preparation for market or use of agricultural, agronomic, horticultural, silvicultural and aquacultural crops and commodities and is:
>
> (1) not less than ten contiguous acres in area; or
>
> (2) less than ten contiguous acres in area but has an anticipated yearly gross income of at least $10,000.

---

4.  Assuming that the use of biosolids is a "normal agricultural operation," an issue discussed herein below.

The term includes new activities, practices, equipment and procedures consistent with technological development within the agricultural industry. Use of equipment shall include machinery designed and used for agricultural operations, including, but not limited to, crop dryers, feed grinders, saw mills, hammer mills, refrigeration equipment, bins and related equipment used to store or prepare crops for marketing and those items of agricultural equipment and machinery defined by the act of December 12, 1994 (P.L. 944, No. 134), known as the Farm Safety and Occupational Health Act. Custom work shall be considered a normal farming practice.

3 P.S. § 952. Practices that do not qualify as "normal agricultural operations" are not protected under the RTFA. The trial court ruled that "the application of biosolids does constitute an activity or practice that has been adopted or used by farmers," and is consistent with technological development, and accordingly, meets the RTFA's definition of a "normal agricultural operation." Trial Court Opinion, 12/28/2012, at 13.

On appeal, the Farm Parties contend that the application of biosolids on farmland is a "normal agricultural operation" as a matter of law, without any need to review the evidentiary record. Farm Parties' Brief at 17–21. In this regard, the Farm Parties point out that in 1998, the legislature amended the definition of "normal agricultural operations" to delete a prior limitation of "customary and generally accepted" activities, practices, equipment, and procedures engaged in "year after year," and instead added the phrase "new activities, practices, equipment and procedures consistent with technological development within the agricultural industry." *Id.* at 20. The trial court concurred with the Farm Parties that the use of biosolids is indeed a new practice "consistent with technological development within the agricultural industry," citing to regulations authorizing the regulated use of biosolids promulgated by the United States Environmental Protection Agency ("EPA") in 1993 and the PaDEP in 1997. Trial Court Opinion, 12/28/2012, at 12. The trial court further noted that PaDEP regulations define "normal farming operations" under Pennsylvania's Solid Waste Management Act ("SWMA") to include using waste to improve soil, and that the Commonwealth Court, in *Hempfield Twp. v. Hapchuk*, 153 Pa.Cmwlth. 173, 620 A.2d 668 (1993), has interpreted this regulatory definition to conclude that the application of sewer sludge is a "farming and agricultural use." *Id.* at 672; Trial Court Opinion, 12/28/2012, at 12.

Contrary to these arguments, however, nowhere in the definition of "normal agricultural operation" did the legislature include any language suggesting that the application of biosolids on farmland meets this definition. At the time of the amendment of the definition in 1998, the EPA (in 1993) and the PaDEP (in 1997) had both issued regulations authorizing the use of biosolids on farmland, but the legislature did not include the use of biosolids in its amended definition as a new practice "consistent with technological development within the agricultural industry." A specific mention of biosolids was undoubtedly an option available to the legislature at that time, since other practices (*e.g.*, custom work) and types of equipment (*e.g.*, crop dryers, feed grinders, saw mills, hammer mills, refrigeration equipment) are clearly identified. As such, we cannot agree with the contention that the legislature's amendment of the definition in 1998 was specifically intended to incorporate the application of biosolids as a "normal agricultural operation."

We likewise reject the contention that the PaDEP's regulatory definition of "nor-

mal farming operations" under the SWMA or the Commonwealth Court's interpretation of this definition in the *Hempfield* case compels a conclusion that the use of biosolids qualifies as a "normal agricultural operation" as a matter of law. To the contrary, in subsequent decisions the Commonwealth Court has emphatically ruled to the contrary. In *Com., Office of Atty. Gen. ex rel. Corbett v. East Brunswick Twp.,* 956 A.2d 1100 (Pa.Cmwlth.2008), for example, the Attorney General of Pennsylvania brought an action in the Commonwealth Court pursuant to Act 38, 3 P.S. §§ 311–318, which directs the Attorney General to review local ordinances upon the request of any owner or operator of a "normal agricultural operation" and to determine whether the local ordinance enforces the policy set forth in section 953 of the RTFA not to impede "normal agricultural operations." 3 P.S. §§ 311–318. Act 38 adopts and incorporates the RTFA's definition of "normal agricultural operation." *Id.* at §§ 312; 952.

In *East Brunswick,* the Attorney General challenged a local ordinance regulating the application of biosolids on farmland as fertilizer. For three reasons, a three-judge panel of the Commonwealth Court concluded that summary judgment in favor of the Attorney General was not warranted, since whether the use of biosolids is a "normal agricultural operation" is "a factual determination based upon evidence" rather than a legal determination based upon the SWMA regulations or its prior decision in *Hempfield:*

> First, the legislature did not expressly incorporate by reference Section 103 of the SWMA into Act 38, as it did expressly incorporate [the definition of 'normal agricultural operation'] of the [RTFA]. Indeed, Section 103 provides that its definitions are to be followed "when used in this act," *i.e.,* the SWMA; it does not expand its definitions for use

in other statutes, such as Act 38. Further, the regulation upon which the Attorney General relies was not adopted by the Department of Agriculture under authority of the [RTFA]. Rather, it was adopted by [PaDEP] under the SWMA, a statute not intended to promote agriculture but to regulate 'solid waste practices.' Section 102 of the SWMA, 35 P.S. § 6018.102.

> Second, Act 38 directs the Attorney General to seek expert opinions from the Secretary and Dean of the College of Agricultural Sciences at Penn State to determine what constitutes a 'normal agricultural operation.' 3 Pa.C.S. § 314(d). This suggests, at a minimum, that the determination of what constitutes a 'normal agricultural operation' is an evidentiary, not a legal, determination. Here, the Township vehemently challenges the finding that the application of sewage sludge to land is either 'normal' or even 'agricultural.' It argues 'corporate … sewage sludge hauling' is an industrial and municipal activity. Township Brief in Support of Preliminary Objections at 10–11.

> Third, as noted by the Township, nowhere in Act 38 is there any mention of sewage sludge or its application to land. Similarly, [the definition of 'normal agricultural operation' of the [RTFA]], which has been incorporated into Act 38, says nothing about sewage sludge. Because the Attorney General has filed for summary relief, there is no evidentiary record, not even an affidavit, on which to make the factual finding that 'sewage sludge application' is a 'normal agricultural operation' and not 'industrial waste disposal,' as asserted by the Township.

*East Brunswick,* 956 A.2d at 1115–16 (footnote omitted). We find the reasoning of the Commonwealth Court on these points to be persuasive.

■ Finally, the Farm Parties argue that courts should decide what constitutes a "normal agricultural operation" as a matter of law since there is "no suggestion in the RTFA that it requires evidentiary hearings or jury trials to determine what is a normal agricultural operation, and reading this into the statute would eliminate the certainly that is the hallmark of a statute of repose." Farm Parties' Brief at 27. In this regard, the Farm Parties contend that statutes of repose are jurisdictional in nature, and thus their scope and applicability pose questions of law for courts. Farm Parties' Brief at 15–16. We agree that statutes of repose are jurisdictional in nature, and that as a result their *scope,* as determined by statutory interpretation, presents a question of law for courts to decide. *See, e.g., Smith v. W.C.A.B.,* 543 Pa. 295, 300, 670 A.2d 1146, 1148–49 (1996).

■ With respect to the *applicability* of statutes of repose, however, issues of fact are often determinative, and a party may avoid summary judgment by identifying sufficient evidence in the record to establish that one or more issues of material fact remain for consideration by the eventual finder of fact. In *McConnaughey v. Building Components, Inc.,* 536 Pa. 95, 637 A.2d 1331 (1994), for example, our Supreme Court reversed a grant of summary judgment in favor of a product manufacturer pursuant to 42 Pa.C.S.A. § 5536, a statute of repose applicable to construction projects. *Id.* at 102, 637 A.2d at 1335. The Supreme Court concluded that a genuine issue of material fact remained with respect to the extent of the manufacturer's involvement in the planning, design, or construction of the structure at issue. *Id.* Likewise, in *Pridgen v. Parker Hannifin Corp.,* 974 A.2d 1166 (Pa.Super.2009), this Court quashed as interlocutory an appeal from a trial court's order denying summary judgment, on the grounds that the trial court properly determined that issues of fact remained regarding the applicability of a statute of repose under the General Aviation Revitalization Act, 49 U.S.C. § 40101. *Id.* at 1172; *see also Stewart v. Precision Airmotive, LLC,* 7 A.3d 266, 277 (Pa.Super.2010), *appeal denied,* 615 Pa. 779, 42 A.3d 294 (2012) (same).

■ We must turn then to the evidentiary record to determine whether a material issue of fact exists with respect to whether the Farm Parties' use of biosolids, as described in the Residents' Amended Complaint, is a "normal agricultural operation." The trial court, in granting summary judgment, found persuasive evidence offered by the Farm Parties and *amici* showing that "over the past 20 years, [PaDEP] has permitted approximately 1,500 sites, including farms, for the application of biosolids, and more than 700 of those sites had active permits as of 2010." Trial Court Opinion, 12/28/2012, at 10–11. PaDEP statistics further showed that more than 70 sites in York County had been approved for the use of biosolids on farmland in the past 15 years. *Id.* at 11. The trial court found it significant that the PaDEP closely regulates this practice. *Id.*

In response to the Residents' contention that 700 farms constitutes only 1% of the 63,163 farms in Pennsylvania and thus provides little evidence that the use of biosolids on farmlands is either a normal or widespread practice, the trial court responded by pointing out that the 1% calculation may be misleading because the total number of farms also includes various types of non-agricultural operations, like livestock and poultry farms. *Id.* at 11–12. The trial court reached no finding of fact, however, as to what a more accurate percentage of farms using biosolids might be. Instead, the trial court observed that the definition of "normal agricultural opera-

tion" is silent as to numbers, and thus "to find that biosolids are not a normal agricultural operation simply based on the fact that the 700 sites constituted only 1% of total farms goes beyond the plain language of the definition, as well as the intent of the RTFA." *Id.* at 12.

Essentially, then, the statistics regarding the number of Pennsylvania farms using biosolids are not determinative, one way or the other, of whether the practice is a "normal agricultural operation." In this regard, we note that just as the definition is silent as to numbers, it is also silent with regard to the effect, if any, of governmental regulation. While it is undoubtedly true that the application of biosolids on farmland is closely regulated by the Pa-DEP, nothing in the definition suggests that governmental regulation of the practice should play any substantial role in determining whether it is a "normal agricultural operation" under the RTFA. As indicated herein above, the PaDEP began regulating the use of biosolids in 1997, but when the legislature amended the definition of "normal agricultural operation" in 1998, no language was added to delineate that the use of biosolids was intended to be included within its scope.

Neither the trial court nor the Farm Parties have directed this Court to any other evidence in the record to establish as a matter of law that the use of biosolids is a "normal agricultural operation." The Residents, on the other hand, point to a substantial quantity of evidence to show that the Farm Parties' particular use of biosolids in this case was not normal or routine and failed to conform to accepted EPA and industry practices. For example, evidence of record, including deposition testimony from several of the Residents, suggests that the Farm Parties took no steps to mitigate odors and other nuisance conditions resulting from their use of biosolids, and had no odor management or nuisance control plans. As such, the Residents argue that "it is not 'normal' for a farm to send odors unlimited in intensity, duration, frequency, or character" across and onto neighboring properties. Residents' Brief at 39. The Residents have submitted an affidavit from an expert on EPA recommended management practices for the use of biosolids. *Id.* at 40. According to this affidavit, these management practices include "selecting remote sites and fields away from neighbors, minimizing storage time for sewage sludge, developing an odor control plan, avoiding land applications during certain wind or weather conditions, ... and having an alternative disposal option for particularly malodorous batches." *Id.* The Residents contend that testimony from representatives of the Farm Parties establishes that they made no attempts to comply with any of these management practices. *Id.* at 11–12.

In our view, the certified record on appeal does not demonstrate as a matter of law that the Farm Parties' use of biosolids at the Farm constitutes a "normal agricultural operation," as that term is defined by the RTFA. The Farm Parties contend that the use of biosolids is "one of the largest and most successful recycling undertakings in America and Pennsylvania," and one regularly used by Pennsylvania farmers. Farm Parties' Brief at 14. The Residents, conversely, contend that the use of biosolids is not a widespread practice, is used by only about 1% of the farms operating in Pennsylvania, and was in any event not "normal" as specifically employed by the Farm Parties in this case. These arguments should be put to a jury for resolution. Summary judgment is reserved only for those cases in which it is clear that no issues of material fact remain and that the moving party is entitled to

judgment as a matter of law. *See, e.g., Toy v. Metropolitan Life Ins. Co.,* 593 Pa. 20, 34, 928 A.2d 186, 195 (2007). With respect to the issue of whether the application of biosolids is a "normal agricultural operation," issues of material fact remain and therefore the trial court erred in granting summary judgment.

■■■■■ For their second issue on appeal, the Residents contend that the trial court erred in granting summary judgment on their claims for negligence and trespass. With respect to the Residents' negligence claims, we find no error. To prove a negligence claim, it is well-established that the plaintiff must establish that the defendant owes the plaintiff a duty "to conform to a particular standard of conduct toward another." *See, e.g., Atcovitz v. Gulph Mills Tennis Club, Inc.,* 571 Pa. 580, 586, 812 A.2d 1218, 1222 (2002). The trial court concluded, and we agree, that the Residents have not identified any duty under Pennsylvania law that requires a property owner to use his or her property in such a manner that it protects neighboring landowners from offensive odors or other nuisance conditions. Trial Court Opinion, 12/28/2012, at 26–27. As this Court held in *Horne,* while it is true that a nuisance claim can be founded on negligent conduct, a negligence claim cannot be based solely on facts that establish a nuisance claim. *Horne,* 728 A.2d at 960. As in *Horne,* the operative facts here establish that the Residents have asserted nuisance claims, not negligence claims— namely claims based upon a use of property that "is not wrongful in itself, but only in the consequences which may flow from it." *See Kramer,* 341 Pa. at 381, 19 A.2d at 363.

■■■■■ With respect to the Residents' trespass claims, we agree with the Farm Parties that the Residents have waived most of these claims on appeal. In their Amended Complaint, the Residents allege that the Farm Parties committed a trespass by releasing biosolids "into the environment" and thus caused them to enter onto and contaminate the Residents' properties "whether in solid, particulate, or gaseous state." Amended Complaint, 7/23/2010, at ¶ 405. In granting summary judgment dismissing the Residents' trespass claims, the trial court ruled that under Pennsylvania law "intrusions and effects which come through the air, such as noise, odors, smoke, interference with light and air, and the like" have predominated been treated as nuisances rather than trespasses. Trial Court Opinion, 12/28/2012, at 31. On appeal, the Residents have included no argument in their brief to support their claims that the airborne dissemination of odors from the Farm Parties' use of biosolids constitutes a trespass. Accordingly, these claims are waived. *See, e.g., Commonwealth v. Jackson,* 494 Pa. 457, 459 n. 1, 431 A.2d 944, 945 n. 1 (1981) (holding that the failure to address a claim in the argument section of an appellate brief waives consideration of the claim).

Instead, in their appellate brief the Residents restrict their argument to the trespass claims of four Residents, Wendy and Jeff Fodel and Donna and John Freese. Wendy Fodel testified at her deposition that brown water ran across a street from the Farm onto her property. W. Fodel Dep. at 78–81. Jeff Fodel testified that Troyer had deposited stone in a little stream on the Farm, and that "[i]t hit that stone and went right across the street on my property." J. Fodel Dep. at 155. Donna Freese testified that she observed "large chunks" of biosolids on her property. D. Freese Dep. at 83. Her husband testified that biosolids were diverted onto his property after having been applied on a severe slope directly across the street. J. Freese Dep. at 63–67. He further testified

that he informed the person applying the biosolids of the condition, but "he just happily went on his way." *Id.* at 66–68.

Section 158 of the Restatement (Second) of Torts governs trespass claims in Pennsylvania:

### § 158 Liability for Intentional Intrusions on Land

One is subject to liability to another for trespass, irrespective of whether he thereby causes harm to any legally protected interest of the other, if he intentionally

(a) enters land in the possession of the other, or causes a thing or a third person to do so, or

(b) remains on the land, or

(c) fails to remove from the land a thing which he is under a duty to remove.

Restatement (Second) of Torts § 158 (1965); *Smith v. King's Grant Condo.*, 418 Pa.Super. 260, 614 A.2d 261, 267 (1992), *affirmed*, 537 Pa. 51, 640 A.2d 1276 (1994). The comment to clause (a) provides that "it is not necessary that the foreign matter should be thrown directly and immediately upon the other's land," and that instead "[i]t is enough that an act is done with knowledge that it will to a substantial certainty result in the entry of the foreign matter." *Id.* at Comment.

Based upon our review of the deposition testimony of the Fodels and the Freeses, we must conclude that they have offered sufficient evidence to create issues of material fact precluding the dismissal of their trespass claims. These four Residents all contend that biosolids, both in liquid and solid forms, have entered their properties directly from the Farm. Moreover, the testimony of Jeff Yodel and John Freese provides evidence that the entry of biosolids onto their properties was the result of conduct by the Farm Parties "with knowledge that it will to a substantial certainty result in the entry of the foreign matter"—including the placement of stone in a stream on the Farm diverting contaminated water onto the Yodels' property, and the placement of biosolids on a severe slope directly across the street from the Freeses' property.

Order reversed. Case remanded to the trial court for further proceedings consistent with this decision. Jurisdiction relinquished.

PLATT, J. files a Dissenting Opinion.

### DISSENTING OPINION BY PLATT, J.:

I respectfully dissent. In my view, Appellants' complaint was untimely filed, based on the one-year statute of repose at 3 P.S. § 954(a). Therefore, I would affirm the trial court's decision.

The leaned Majority concludes that "issues of material fact remain with respect to whether the use of biosolids in this case is a 'normal agricultural operation'" to determine that Appellees' conduct fell outside the statute of limitation set forth in the Right to Farm Act (RTFA) at 3 P.S. § 954(a). (Majority Opinion, at 39). I believe this conclusion is unwarranted.

It is well-settled that "the statute of limitations begins to run as soon as the right to institute and maintain a suit arises." *Hopkins v. Erie Ins. Co.*, 65 A.3d 452, 460 (Pa.Super.2013) (citation omitted).

The Majority correctly concludes that the circumstances constituting the basis of the nuisance action, the application of biosolids on Appellees' farm, began in March 2006, and Appellants filed their complaint in July 2008. (Majority Opinion, at 39–41, 44–45, 45–46).

The Majority contends, however, that the application of biosolids fails to qualify

as a "normal agricultural operation," in order to apply the statute of repose. (*Id.* at 46). It acknowledges that there are EPA and industrial guidelines on biosolid application, which strongly suggests that the use of biosolids is, contrary to its determination, a normal agricultural practice under 3 P.S. § 952. (*Id.* at 46–47, 50). Instead, the Majority concludes that there remains a genuine issue of material fact as to whether the use of biosolids "was in any event not 'normal' as specifically employed by the Farm Parties in this case." (*Id.* at 50). However, this exception is unwarranted, because it conflates our standard for grant of summary judgment with the question of law raised by whether the statute of limitations has run. *See Wilson v. Transp. Ins. Co.*, 889 A.2d 563, 570 (Pa.Super.2005).

The cases relied on by the Majority do not stand for its assertion that "[w]ith respect to the *applicability* of statutes of repose, ... issues of fact are often determinative, and a party may avoid summary judgment by identifying sufficient evidence in the record to establish that one or more issues of material fact remain for consideration by the eventual finder of fact." (Majority Opinion, at 49); *see, e.g. McConnaughey v. Building Components*, 536 Pa. 95, 637 A.2d 1331 (1994) (genuine issue of material fact regarding whether appellee was involved in allegedly tortious conduct).

Here, there is no genuine issue of material fact as to the identity of the parties, the date of commencement of the application of biosolids, or the date on which Appellants filed their complaint. *See Hopkins, supra* at 460. We cannot reach the question of whether the application of biosolids "was in any event not 'normal' as specifically employed by the Farm Parties in this case" because Appellants' complaint was not timely filed. (*Id.* at 50). Thus, I believe that the Majority erred in sidestep-

ping the statute of limitations in order to reach the issues raised by Appellants' untimely nuisance claim.

Therefore, I would conclude that the trial court correctly determined that summary judgment was appropriate where Appellants' complaint was untimely under the one-year statute of limitation under the RTFA at 3 P.S. § 954(a). *See Horne v. Haladay*, 728 A.2d 954, 954 (Pa.Super.1999), *appeal denied*, 560 Pa. 727, 745 A.2d 1223 (1999).

I would affirm the grant of summary judgment by the trial court. Accordingly, I respectfully dissent.