**[J-32-2015]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**


**SAYLOR, C.J., EAKIN, BAER, TODD, STEVENS, JJ.**


| | |
|---|---|
| RALPH GILBERT, GLORIA GILBERT, MICHELLE TORGERSON, EDWIN TORGERSON, MELDA BITTORF, BEVERLY COX, WILLIAM COX, KIMBERLY MILES, CLEA FOCKLER, JOHN FOCKLER, LINDA ECKERT, SCOTT ECKERT, WILLIAM STRINE, KENNY JASINSKI, DENNIS JASINSKI, KATHRYN JASINSKI, JOSEPH JASINSKI, PATRICIA UNVERZAGT, MEGAN JACOBS, BARBARA UNVERZAGT, DONNA PARR, JEFF FODEL, WENDY FODEL, JENNIFER JASINSKI, JOHN JASINSKI, JUDY QUEITZSCH, JEAN FRY, RICK MCSHERRY, JOHN FREESE, DONNA LYNN FREESE, JEFF VAN VOORHIS, SUSAN LEE FOX, TERRENCE FANCHER AND DONNA FANCHER, | : No. 121 MAP 2014 <br> : <br> : Appeal from the Order of the Superior <br> : Court dated April 15, 2014, at No. 119 MDA <br> : 2013, reversing and remanding the Order <br> : of the Court Common Pleas of York <br> : County, Civil Division, dated December 28, <br> : 2012, at No. 2008-SU-003249-01 <br> : <br> : ARGUED:   May 5, 2015 |
| Appellees | |
| v. | |
| SYNAGRO CENTRAL, LLC, SYNAGRO MID-ATLANTIC, GEORGE PHILLIPS, HILLTOP FARMS AND STEVE TROYER, | |
| Appellants | |


**OPINION**


**MR. JUSTICE EAKIN**                    **DECIDED:   December 21, 2015**

In this appeal, we are asked to determine whether a trial court or a jury should determine the applicability of § 954(a) of the Right to Farm Act (RTFA), 3 P.S. §§ 951-957, which precludes nuisance actions against farms under certain circumstances, and whether the trial court in the instant case properly concluded the land application of biosolids as fertilizer is a "normal agricultural operation," rendering § 954(a) applicable. We hold § 954(a) is a statute of repose; its applicability, as determined by statutory interpretation, is a question of law for courts to decide. Further, the trial court properly held biosolids application falls within the RTFA's definition of "normal agricultural operation," which bars appellees' nuisance claims. Accordingly, we reverse the portion of the Superior Court's order that reversed the grant of summary judgment for appellants on the nuisance claims; we affirm the remainder of the order.

## Background

Appellees are 34 individuals who own or reside on properties adjacent to a 220-acre farm in York County, Pennsylvania, owned since 1986 by appellant George Phillips. Phillips operates his own farm, Hilltop Farms, and leases part of the land to appellant Steve Troyer, who raises various crops. Appellants Synagro Central, LLC and Synagro Mid-Atlantic are corporate entities engaged in the business of recycling biosolids[1] for public agencies for land application; they contract with municipalities to recycle and transport biosolids, which are then used as fertilizer.

---

[1] At the trial level, the parties disputed the composition of the biosolids. See Trial Court Opinion, 12/31/12, at 2 n.2. Appellees characterized the substance as "sewage sludge," which is "the solid by-product of sewage treatment," id., at 2 (quoting Complaint, 7/3/08, ¶ 43), and is a "viscous, semi-solid mixture of bacteria, virus-laden organic matter, toxic metals, synthetic organic chemicals, and settled solids removed from domestic and industrial waste water at sewage treatment plants." Gilbert v. Synagro Cent., LLC, 90 A.3d 37, 39 (Pa. Super. 2014) (quoting Amended Complaint, 7/23/10, ¶ 53). Appellees further alleged "the sludge treatment process often raises the pH to a level where it 'is irritating to skin, nose, throat and lungs, and can cause rashes and burns.'" Id. (quoting (continued…)

In 2005, Synagro obtained a permit from the PaDEP to provide Phillips and Hilltop Farms with biosolids. Over approximately 54 days between March 2006 and April 2009, approximately 11,635 wet tons of biosolids were applied to 14 fields at the farm. The biosolids were spread over the fields' surface and not immediately tilled or plowed into the soil.[2] Appellees contended that as soon as the biosolids were applied, extremely offensive odors emanated; many of the appellees were long-time farm residents and

(…continued)
Amended Complaint, 7/23/10, ¶¶ 55-56). Appellants contended appellees' definition was inaccurate and incomplete, mischaracterizing the substance referred to as "biosolids." While the factual issue concerning the composition of biosolids is not at issue before this Court, we note the Pennsylvania Department of Environmental Protection (PaDEP) defines "biosolids" as "nutrient-rich organic material produced from the stabilization of sewage sludge and residential septage that meet specific criteria and are suitable for land application[,]" and defines "sewage sludge" as "a solid, semisolid or liquid residue generated during the treatment of wastewater in a treatment works." http://www.dep.pa.gov/Business/Water/PointNonPointMgmt/WastewaterMgmt/Biosolids/_layouts/mobile/dispform.aspx?List=491a3e8f-ecc5-4d61-9747-9871b71c7255&View=abe0d60e-80f1-404a-a8b4-7042bee07677&ID=4 last visited December 21, 2015. Similarly, the United States Environmental Protection Agency (EPA) defines "biosolids" as "treated sewage sludge that meets the EPA pollutant and pathogen requirements for land application and surface disposal[,]" and in turn defines "sewage sludge" as "the solids separated during the treatment of municipal wastewater." http://www.epa.gov/region9/water/npdes/sludge.html last visited July 27, 2015; see also http://www.merriam-webster.com/dictionary/biosolid last visited July 27, 2015 (defining "biosolid" as "solid organic matter recovered from a sewage treatment process and used especially as fertilizer").

[2] According to amici curiae Pennsylvania Municipal Authorities Association, Allegheny County Sanitary Authority, and National Association of Clean Water Agencies, Hilltop Farms' conservation plan required it to use no-till agriculture, which provides many environmental benefits, but prevented appellants from plowing the biosolids under the soil, which is a major odor control strategy. Amici Curiae Pennsylvania Municipal Authorities Association, Allegheny County Sanitary Authority, and National Association of Clean Water Agencies' Brief in Support of Appellants, at 22 n.2.

were thus accustomed to the smell of animal manure,[3] and characterized the biosolids' odor as unusually noxious, so bad that they could not leave their homes on many occasions. Appellees described the odor and its impact as: "smells like a dead horse[,]" "the most horrendous smell I ever smelled[,]" Cleo Fockler Deposition, 1/17/12, at 40, 41; "smelled like dead animals[,]" Beverly Cox Deposition, 1/19/12, at 65; "typically smelling like a herd of dead, rotting deer[,]" Gilbert, at 40 (quoting Amended Complaint, 7/23/10, ¶ 86), "I can tell you the difference between manure — this doesn't even go on the same scale as that …. It smelled like death[,]" Scott Eckert Deposition, 1/30/12, at 37; "[t]hat smell changed the way we lived[,]" "made your kids stay in … [m]ade you close your windows when you didn't want to … [m]ade you tell people not to come visit you, or people that came visit you said they aren't staying[,]" Terrence Fancher Deposition, 2/24/12, at 36; "like rotting flesh … [n]auseating, repulsive stench[,]" Susan Fox Deposition, 4/4/12, at 112; "was a lot stronger odor [than animal manure], and it stayed constantly[,]" Rickey McSherry Deposition, 2/3/12, at 29; and "like a dead, rotting flesh type of situation[,]" Joseph Jasinski Deposition, 4/12/12, at 56. During the period the biosolids were applied, appellees described suffering from physical symptoms such as burning eyes, sore throats, coughing, headaches, and nausea. See, e.g., Melda Bittorf Deposition, 1/18/12, at 28-29; Wendy Fodel Deposition, 3/6/12, at 119; William Strine Deposition, 1/18/12, at 140-41; Terrence Fancher Deposition, 2/24/12, at 144-45; Susan Fox Deposition, 4/4/12, at 94, 170; Kathryn Jasinski Deposition, 4/12/12, at 114, 128-29; Jeffrey Van Voorhis Deposition, 3/20/12, at 144, 271-72.

---

[3] "I enjoy the smell of manure. I think it is the most down-to-earth country smell that you could smell. I go outside and take a big whiff. I enjoy it." John Freese Deposition, 1/31/12, at 48.

Appellees complained about the odor to Phillips and Synagro, as well as local officials via petitions, and at a township hearing, all to no avail. The Shrewsbury Township Board of Supervisors complained in writing to the PaDEP and state officials regarding their disappointment that there had been no effective resolution. See Appendix to Plaintiffs' Response in Opposition to Defendants' Motion for Summary Judgment, Vol. IV, Ex. III, Shrewsbury Township Letter, 9/10/07. Although the PaDEP, which with the York County Solid Waste Authority monitored the application of the biosolids, issued notices of violation to Synagro in 2006, 2007, and 2009, none of these involved odors; the violations involved spreading the biosolids beyond designated areas and tilling too soon after application. See Appendix to Defendants' Motion for Summary Judgment, Vol. I, Exs. O-Q.

In July 2008, appellees filed two similar three-count complaints, which were consolidated; they also filed an amended complaint in 2010. In Count I, appellees alleged appellants' biosolids activities created a private nuisance. Count II alleged negligence by appellants in their duty to properly handle and dispose of the biosolids. Count III alleged appellants' biosolids activities constituted a trespass on appellees' land. Appellees sought injunctive relief, compensatory and punitive damages, and attorney's fees and costs. In October 2009, after receiving the third notice of violation from the PaDEP, Synagro notified the PaDEP it was suspending the use of biosolids at Hilltop Farms, rendering appellees' request for injunctive relief moot. The last application of biosolids at the farm occurred in April 2009.

Appellants moved for summary judgment on the basis that appellees' nuisance claims were barred by the one-year statute of repose in § 954(a) of the RTFA, which provides, in relevant part:

> No nuisance action shall be brought against an <u>agricultural operation</u> which has <u>lawfully been in operation for one year or more prior to the date of</u>

bringing such action, where the <u>conditions or circumstances complained of</u> as constituting the basis for the nuisance action have <u>existed substantially unchanged since the established date of operation</u> and are <u>normal agricultural operations</u>[.]

3 P.S. § 954(a) (emphasis added).[4]

Appellees filed a response in opposition. The trial court denied appellants' motion, reasoning that as the RTFA does not specifically mention biosolids, and as the parties did not present supporting evidence, it was unclear whether biosolids application was a "normal agricultural operation" within the RTFA's protection; thus, appellants were not entitled to summary judgment. See Trial Court Opinion, 10/14/11, at 8-9.

Following extensive discovery, appellants filed a second motion for summary judgment; appellees again filed a response in opposition. This time, the trial court granted the motion, concluding appellees' nuisance claims were barred by § 954(a).[5]

---

[4] The latter portion of subsection (a) also bars nuisance actions where:

> the physical facilities of such agricultural operations are substantially expanded or substantially altered and the expanded or substantially altered facility has either: (1) been in operation for one year or more prior to the date of bringing such action, or (2) been addressed in a nutrient management plan approved prior to the commencement of such expanded or altered operation pursuant to … the Nutrient Management Act, and is otherwise in compliance therewith[.]

Id. The parties agreed this latter portion did not apply, as neither side contended Hilltop Farms' physical facilities had been substantially altered or expanded. See Gilbert, at 43.

[5] Before the trial court, appellees also argued the three notices of violation issued by the PaDEP implicated subsection (b) of the statute of repose, which provides the statute shall not defeat the right to recover damages sustained from an agricultural operation which is conducted in violation of any federal, state, or local governmental regulation. The trial court rejected this claim because appellees did not allege any of their injuries were a result of those violations. Appellees did not appeal this determination to the Superior Court; therefore, the applicability of subsection (b) is not at issue here. See Gilbert, at 43 (citing Trial Court Opinion, 12/31/12, at 20-21).

The trial court held the land application of biosolids met the RTFA's definition of a "normal agricultural operation." See Trial Court Opinion, 12/31/12, at 13; see also 3 P.S. § 952. In determining whether § 954(a) barred appellees' claim, the court held the term "agricultural operation" referred to the farm itself and was distinct from the term "normal agricultural operations," which were the activities conducted on the farm. See Trial Court Opinion, 12/31/12, at 18. The court further held "established date of operation" referred to the time the farm began operating. Id. (citing Horne v. Haladay, 728 A.2d 954 (Pa. Super. 1999)). Viewing the crucial determination as being whether the farm operated in a "substantially unchanged" manner since its inception in 1986 — i.e., whether the application of biosolids constituted a substantial change — id., at 19, the trial court concluded such application was not a substantial change, as farms have used various types of fertilizer for centuries, id., at 20. Accordingly, the trial court held because the farm had lawfully been in operation for more than a year prior to the filing of appellees' complaint, and the application of fertilizer was a normal agricultural operation that had existed substantially unchanged since the farm began operating, § 954(a) barred appellees' nuisance claims. Id.

Regarding appellees' negligence claims, the trial court noted appellees failed to allege specifically what duty appellants owed them, which was essential to their claims. Id., at 26. Furthermore, the court reasoned, "while the law provides that a nuisance action may be founded on negligent conduct, a negligence claim cannot solely be based on facts which support the nuisance claim." Id., at 27 (citing Horne, at 959-60). Accordingly, as the facts supporting appellees' negligence claims mirrored those in their nuisance claims, which were barred by § 954(a), the court held the negligence claims failed. Id., at 28.

Finally, the trial court held appellees failed to plead a prima facie case of trespass because they did not allege appellants intentionally caused the biosolids to enter their property, but only that appellants intentionally stored and used the biosolids. See id., at 31 (noting intentionally causing thing to enter or remain on another's land, or failing to remove thing, is essential to trespass claim). Regarding odor as a potential basis for appellees' claim, the court stated it believed

> finding a trespass for odors from a farm would undoubtedly expose any agricultural operation … to much vexation. … [A] person who lives in an area that is more rural or zoned agricultural cannot ask to be immunized from the effects of odors and insects which are inevitably part of agricultural life.

Id., at 32.

Appellees appealed to the Superior Court, which reversed and remanded, holding summary judgment in favor of appellants on appellees' nuisance claims was improperly granted. The panel majority noted the statute of repose in § 954(a) "require[s] a plaintiff either to file the nuisance action within one year of the inception of the agricultural operation or a substantial change in that operation[.]" Gilbert, at 42. The court stated § 954(a)'s express terms contain three requirements for a nuisance action to be barred: (1) the agricultural operation has an established date of operation at least one year prior to the filing of the action; (2) the conditions or circumstances constituting the basis of the action have been substantially unchanged since the established date of operation; and (3) the conditions are a "normal agricultural operation," as defined in § 952 of the RTFA. Id., at 43.

Regarding the first requirement, the majority noted appellants questioned why the trial court designated the farm's "established date of operation" as being when Phillips bought it in 1986, when the land was used for farming for many years prior to that date; however, appellants conceded determination of this issue was unnecessary, because

regardless of whether the established date was 1986 or some earlier year, appellees'
lawsuit was not filed until 2008, well beyond the one-year requirement. Id., at 44. Thus,
the majority implicitly held the first requirement was met.

Regarding the second requirement, the majority held the "conditions or
circumstances complained of as constituting the basis for the nuisance action" referred to
the application of biosolids at the farm. Id. Accordingly, because the "condition" was
the application of biosolids "that resulted in extremely foul odors and health effects[,]" the
majority disagreed with the trial court's holding that because fertilizer had been used in
one form or another since the farm's inception, the use of biosolids was not a substantial
change. Id., at 45 (emphasis in original). Instead, the majority believed a genuine issue
of material fact existed regarding whether the switch to biosolids in 2006 constituted a
substantial change. Despite this factual issue, the majority concluded the second
requirement was still satisfied, as the alleged change in 2006 occurred more than one
year before appellees' nuisance action was filed in 2008, reasoning, "A substantial
change does not eliminate subsection 954(a)'s one-year statute of repose entirely, but
rather merely resets it, permitting the filing of a nuisance action within one year from the
date of the substantial change." Id. (emphasis added) (citing Horne, at 956). The
majority relied on Horne[6] and the legislative intent underlying the RTFA to support its
interpretation of § 954(a) as containing a "reset" provision, despite a lack of specific
language to this effect in subsection (a); to conclude otherwise, the majority reasoned,
would eliminate the statute of repose after any substantial change resulting in a nuisance,

---

[6] In Horne, the agricultural operation, a poultry business, began in 1993, and introduced
a decomposition house in August 1994; the plaintiff filed a nuisance suit based on the
house's odor in November 1995. The Horne court held § 954(a) barred the lawsuit even
if the decomposition house constituted a substantial change, as the suit was not filed until
more than one year after the house was constructed. See Horne, at 956.

making farms vulnerable to nuisance suits — in contravention of the RTFA's stated policy of limiting the circumstances under which farms can be sued for nuisance. Id., at 46 (citing 3 P.S. § 951). The majority further held an increase in the nuisance does not constitute a substantial change for purposes of applying the reset provision, as the use or conduct forming the basis for the nuisance has not changed. Id.

Regarding the third requirement, the majority disagreed with the trial court's holding the use of biosolids met the RTFA's definition of "normal agricultural operation," as the definition — amended in 1998, after the approval of the use of biosolids and promulgation of regulations for their use — did not specifically mention such practice, and the legislature was undoubtedly aware of this option and could have included it, had it wished to do so. Id., at 47.

The majority found persuasive the reasoning in Commonwealth, Office of Att'y Gen. ex rel. Corbett v. E. Brunswick Twp., 956 A.2d 1100 (Pa. Cmwlth. 2008). There, the Attorney General challenged a local ordinance, which regulated the application of biosolids as farmland fertilizer, as violating the Agricultural, Communities and Rural Environment Act (ACRE, or Act 38), 3 Pa.C.S. § 311-318.[7] The Commonwealth Court denied the Attorney General's application for summary relief because the issue of whether the use of biosolids was a "normal agricultural operation" was not clear as a matter of law. E. Brunswick, at 1116. The court first noted the lack of express

---

[7] Act 38 prohibits municipalities from adopting ordinances that prohibit or limit "normal agricultural operations." See id., § 312(1). The Act directs the Attorney General to review local ordinances upon the request of any owner or operator of a "normal agricultural operation" to determine whether the ordinance supports the RTFA's policy of not impeding "normal agricultural operations." Id., § 314(a). Act 38 adopts the RTFA's definition of "normal agricultural operation." Id., § 312. In E. Brunswick, the Township argued application of biosolids was not a "normal agricultural operation" as defined by Act 38, and thus the ordinance at issue could not be challenged under Act 38.

incorporation by reference of the Solid Waste Management Act's (SWMA) definition of "normal farming operations,"[8] which expressly includes the use of biosolids as fertilizer, into Act 38. E. Brunswick, at 1115. Second, the court reasoned Act 38's directing the Attorney General to seek expert opinions regarding what constitutes a "normal agricultural operation" suggested this was an evidentiary, not a legal, determination. See id. (citing 3 Pa.C.S. § 314(d)). Finally, the court noted neither Act 38's nor the RTFA's definition of "normal agricultural operation," which was incorporated into Act 38, mentioned "sewage sludge or its application to land." Id. Because the Attorney General moved for summary relief, there was no evidentiary record on which to make the factual finding that application of biosolids was a "normal agricultural operation"; therefore, the court concluded, the issue was not clear as a matter of law. Id., at 1115-16.

Here, the majority acknowledged the RTFA, unlike Act 38, does not require fact finding to determine what constitutes a "normal agricultural operation"; however, the court stated although statutes of repose, like § 954(a), are jurisdictional and their scope is a question of law for courts to decide, their applicability is often determined by issues of fact, which are properly reserved for the fact finder. Gilbert, at 49. In support of this conclusion, the majority relied on McConnaughey v. Bldg. Components, Inc., 637 A.2d 1331 (Pa. 1994) (reversing grant of summary judgment where there was genuine issue of material fact regarding extent of manufacturer's involvement in planning, design, or construction of structure at issue, when such involvement was required for statute of repose pertaining to construction projects, 42 Pa.C.S. § 5536, to apply); Stewart v. Precision Airmotive, LLC, 7 A.3d 266 (Pa. Super. 2010) (quashing, as interlocutory, appeal from grant of summary judgment when issues of fact remained regarding

---

[8] See 35 P.S. § 6018.103.

applicability of statute of repose under General Aviation Revitalization Act, 49 U.S.C. §
40101); and Pridgen v. Parker Hannifin Corp., 974 A.2d 1166 (Pa. Super. 2009) (same).
The majority held here, as in the foregoing cases, there was a genuine issue of material
fact regarding whether appellants' use of biosolids was a "normal agricultural operation."
See Gilbert, at 49.

Specifically, the majority held the statistics both parties cited in favor of their
respective positions[9] were not determinative, as the RTFA's definition of "normal
agricultural operation" was silent regarding numbers. Id., at 49-50. Likewise, the
majority reasoned, the fact that the application of biosolids is closely regulated by the
PaDEP had no bearing, as the statutory definition did not mention governmental
regulation. Id., at 50. Noting appellees "point[ed] to a substantial quantity of evidence
to show that [appellants'] particular use of biosolids in this case was not normal or routine
and failed to conform to accepted EPA and industry practices[,]"[10] the majority held the
record "d[id] not demonstrate as a matter of law that [appellants'] use of biosolids at the
[f]arm constitutes a "normal agricultural operation,' as that term is defined by the RTFA."
Id. (emphasis added). Thus, the majority held the trial court erred in granting summary
judgment for appellants, as there was a material question of fact — i.e., whether

---

[9] Appellants and amici offered evidence that the PaDEP has permitted the application of
biosolids on approximately 1,500 sites, including farms, during the past 20 years, and
over 700 sites had active permits as of 2010. Additionally, more than 70 sites in York
County, where Hilltop Farms is located, have been approved for biosolids use in the past
15 years. See id. Appellees pointed out 700 farms constitute only 1% of the 63,163
farms in Pennsylvania. Id.

[10] The majority stated appellees' evidence tended to show appellants took no steps to
mitigate odors, had no odor management or nuisance control plans, and made no attempt
to comply with EPA-recommended biosolids management practices. Id.

appellants' use of biosolids was a "normal agricultural operation" — that should have been resolved by a jury. Id., at 50-51.

Turning to appellees' negligence claims, the majority held the trial court's grant of summary judgment was proper because appellees did not identify any duty on the part of a property owner to use his property in a manner that protects his neighbors from nuisance conditions; a negligence claim cannot be founded solely on facts establishing nuisance. Id., at 51 (citing Trial Court Opinion, 12/31/12, at 26-27; Horne, at 960).

Regarding appellees' trespass claims as they related to the biosolids' odor, the majority held them waived, as appellees included no argument in support of the claim that the airborne dissemination of odors constituted a trespass. Id. Rather, appellees' argument focused on the claims of four appellees that brown water and large chunks of biosolids were diverted onto their property from Hilltop Farms through appellants' intentional conduct. See id., at 51-52 (quoting Restatement (Second) of Torts § 158 (1965)) (citing Wendy Fodel Deposition, 3/6/12, at 78-81; Jeff Fodel Deposition, 3/27/12, at 155; Donna Freese Deposition, 1/31/12, at 83; John Freese Deposition, 1/31/12, at 63-68). The majority held this evidence created issues of material fact precluding the dismissal of these four appellees' trespass claims. Accordingly, the majority reversed and remanded to the trial court for further proceedings on this portion of the trespass claims, along with the nuisance claims. Id., at 52.

Judge Platt dissented, stating although he agreed the circumstances constituting the basis of the nuisance action began in 2006, when the biosolids were first applied, he disagreed that § 954(a)'s statute of repose was inapplicable. Id., at 52-53 (Platt, J., dissenting). The dissent believed the majority's conclusion that there was a genuine issue of material fact regarding whether appellants' use of biosolids was a "normal agricultural operation" within the meaning of § 954(a) "conflate[d] [the] standard for grant

of summary judgment with the question of law raised by whether the statute of limitations has run." Id., at 53. Judge Platt distinguished McConnaughey and the other cases the majority relied on for the proposition that the applicability of statutes of repose is a question of fact, noting in McConnaughey there was a dispute over whether the defendant had engaged in the allegedly tortious conduct. Id. In contrast, the dissent pointed out, "Here, there is no genuine issue of material fact as to the identity of the parties, the date of commencement of the application of biosolids, or the date on which [appellees] filed their complaint." Id. Accordingly, the dissent reasoned, the majority sidestepped the issue of § 954(a)'s applicability, which was purely a question of law for the court, and inappropriately reached the issue of whether the application of biosolids in this particular case was "normal," which went to the merits of the underlying nuisance claim and would be a jury question in a proper case. Id. Therefore, the dissent would have affirmed the grant of summary judgment for appellants, as appellees' complaint was untimely under § 954(a). Id.

We granted review to determine:

Did the Superior Court incorrectly interpret the Pennsylvania [RTFA] by requiring a jury trial to determine that the land application of biosolids falls within the Act's definition of a "normal agricultural operation," which was contrary to the Act and this Court's precedent that statutes of repose and statutory interpretation present questions of law for resolution by courts, not juries?

Gilbert v. Synagro Cent., LLC, 101 A.3d 1149, 1150 (Pa. 2014) (per curiam).

Thus, our inquiry is two-fold: we must first determine whether the applicability of § 954(a) of the RTFA is a question of fact for a jury or a legal question for the court. If we conclude this determination is for the jury, then the Superior Court's holding was proper. If we conclude the court is the proper arbiter, we must then review the trial court's conclusion that the application of biosolids constitutes a "normal agricultural operation"

within the meaning of the RTFA. Accordingly, resolution of the issue presents legal questions involving statutory interpretation, for which our standard of review is de novo and our scope of review is plenary. Bowling v. Office of Open Records, 75 A.3d 453, 466 (Pa. 2013). Additionally, because the trial court concluded there were no material issues of fact concerning the applicability of § 954(a), thereby entitling appellants to summary judgment, we must also apply the standard of review for the grant of summary judgment:

> This Court's scope of review of an order granting summary judgment is plenary. Basile v. H & R Block, Inc., 563 Pa. 359, 761 A.2d 1115, 1118 (2000). Our standard of review is clear: the trial court's order will be reversed only where it is established that the court committed an error of law or clearly abused its discretion. Id. Summary judgment is appropriate only in those cases where the record clearly demonstrates that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Pa.R.Civ.P. 1035.2; see also Murphy v. Duquesne Univ. of the Holy Ghost, 565 Pa. 571, 777 A.2d 418, 429 (2001). The reviewing court must view the record in the light most favorable to the nonmoving party, resolving all doubts as to the existence of a genuine issue of material fact against the moving party. Basile, 761 A.2d at 1118. When the facts are so clear that reasonable minds cannot differ, a trial court may properly enter summary judgment. Id. (citing Cochran v. GAF Corp., 542 Pa. 210, 666 A.2d 245, 248 (1995)).

Atcovitz v. Gulph Mills Tennis Club, 812 A.2d 1218, 1221-22 (Pa. 2002).

### Parties' Arguments

Appellants argue § 954(a) of the RTFA is intended to shield farms from lawsuits initiated more than one year after the start of the farm action that is targeted in the lawsuit. Thus, it is a statute of repose, which extinguishes a cause of action and divests a court of jurisdiction — in contrast to a statute of limitations, which measures when a party must file a lawsuit after a cause of action has accrued and is a defense that must be proven to a jury. Appellants contend because § 954(a) is jurisdictional, its applicability is a question of law to be decided by a court, and only a court may engage in the statutory interpretation necessary to determine whether the practice at issue — here, the application of biosolids

— is a "normal agricultural operation" under § 954(a); to hold otherwise would invade the province of the court and weaken the RTFA "by requiring litigation in the precise circumstances where the legislature determined none should occur." Appellants' Brief, at 14. Appellants acknowledge there may be limited situations where the facts relevant to determining jurisdiction are intertwined with those relating to the merits; however, they argue this is not such a case. They contend McConnaughey, Pridgen, and Stewart, relied upon by the Superior Court majority, are distinguishable from this matter because they involved fact-intensive questions regarding the defendants' conduct; here, there was no question appellants used biosolids as fertilizer. Appellants further contend the Superior Court majority improperly relied on E. Brunswick, which is distinguishable because it turned on statutory and procedural grounds not present in this case. Appellants assert the Superior Court's decision, if left to stand, will "force farm defendants to defend against untimely claims through a jury decision on an issue that should be resolved by a judge before trial." Id., at 15.

Regarding whether § 954(a) bars appellees' nuisance action, appellants argue "agricultural operation" refers to the farming practice conducted on the farm, not the farm itself, and the date the practice began is the "established date of operation." Thus, according to appellants' interpretation of § 954(a), since the biosolids application began in 2006, and appellees did not file their action until 2008, more than one year after the biosolids were first applied, their nuisance claims are barred. However, appellants agree with the Superior Court majority's holding a substantial change in operations may reset the one-year period within which to file suit, noting appellees' nuisance action would still be barred under this interpretation.

Appellants claim the RTFA's definition of "normal agricultural operation" encompasses a multitude of farming practices, including the use of biosolids, despite the

absence of that specific term in the definition. They argue the RTFA's definition does not specify how these practices must be conducted and does not require best practices to be used. Appellants assert the trial court's finding that the application of biosolids is a "normal agricultural operation" under the RTFA is amply supported by related statutes,[11] regulations,[12] case law,[13] the views of executive agencies,[14] and the record. Finally, appellants argue the record compels a finding that the application of biosolids is a "normal agricultural operation," as evidenced by the trial court's conclusion and the positions of numerous amici, as described infra.[15]

---

[11] Appellants note the SWMA classifies biosolids recycling as a "normal farming operation," 35 P.S. § 6018.103 (normal farming operations include "agricultural utilization of septic tank cleanings and sewage sludges which are generated offsite"), and the Nutrient Management Act (NMA), 3 Pa.C.S. §§ 501-522, includes sewage sludge in the list of substances classified as "nutrients" for purposes of nutrient management for certain agricultural operations, id., § 502-503.

[12] Appellants cite the PaDEP's regulations, which define "agricultural utilization" to include "land application of sewage sludge for its plant nutrient value or as a soil conditioner …." 25 Pa. Code § 271.1.

[13] Appellants rely on Hempfield Twp. v. Hapchuk, 620 A.2d 668 (Pa. Cmwlth. 1993), in which the Commonwealth Court determined the application of sewage sludge for farming purposes comported with the prior, non-conforming agricultural use of a land parcel. In holding the use of sewage sludge was "agricultural," the court noted the SWMA includes the use of sewage sludge as fertilizer in the definition of "normal farming operations." Id., at 672 (citing 35 P.S. § 6018.103).

[14] Appellants refer to the positions of the Pennsylvania Department of Agriculture and the Pennsylvania Office of Attorney General, which are amici in this appeal, and the PaDEP, which was an amicus before the Superior Court; these agencies agree application of biosolids is a "normal agricultural operation" that is protected under the RTFA.

[15] Amicus curiae City of Philadelphia argues in support of appellants that the use of biosolids is a "normal agricultural operation," noting: it has a 30-year history of recycling biosolids for fertilizer; since 1990, over one-third of all its biosolids have been used on farms in Pennsylvania and other states; and, in 2014, 15,524 dry tons of its biosolids were used on Pennsylvania farms. Amicus contends allowing juries to determine, on a (continued…)

case-by-case basis, whether the use of biosolids is a "normal agricultural operation" threatens both farmers' ability to employ a well-established farming practice and the success of the City's recycling program. Amicus asserts land application of biosolids is safe, regulated, and aids the development and improvement of Pennsylvania's farmland.

Amici curiae Mid-Atlantic Biosolids Association, Pennsylvania Water Environment Association, and Pennsylvania Septage Management Association argue in support of appellants that the trial court correctly determined biosolids use is a "normal agricultural operation"; the practice is decades old, comprehensively governed by regulations, broadly accepted in the farming community, and — like manure and chemical fertilizer — limited to the "agronomic rate," which is a measure of the crops' nutritional needs based on consideration of all forms of nutrients to be applied. Amici argue the RTFA's expansive language, which defines "normal agricultural operations" to include all manner of farm work (including the use of fertilizer), as well as the regulations governing biosolids use, supports the conclusion that the application of biosolids is agricultural — not a method of waste disposal. Amici point out the NMA, which is an agricultural statute, specifically mentions biosolids along with other nutrients in its regulation requiring nutrient management plans. 3 Pa.C.S. § 503. Amici posit that allowing the Superior Court's decision to stand will permit juries in different counties to determine on an ad hoc basis the viability of nuisance actions based on biosolids use; such inconsistency will disrupt the technically complex, carefully choreographed system of recycling and deter farms from using an economic alternative to manure and chemical fertilizers.

Amici curiae the Attorney General of Pennsylvania and the Pennsylvania Department of Agriculture contend, in support of appellants' position, that the RTFA is part of a comprehensive, regulatory framework and must be interpreted in such context. Amici assert the RTFA is a sweeping, anticipatory statute aimed at present and future protection of farmland; thus, its definition of "normal agricultural operation" is correspondingly broad. Amici note construction of a statute by those charged with executing it is entitled to great weight; therefore, their interpretation of § 952 as including biosolids should be given deference, as it is consistent with other agencies' interpretation and the RTFA's language. Amici argue the Superior Court ignored the RTFA's intent and language. They further contend E. Brunswick, on which the Superior Court relied, was wrongly decided; contrary to the E. Brunswick court's statement, Act 38 mentions biosolids in § 313(c), and its permitting the Attorney General to seek expert consultation regarding what constitutes a "normal agricultural operation" does not turn this statutory construction matter into a question of fact. Rather, amici contend § 954(a) is a statute of repose, the construction of which is a question of law; they posit McConnaughey and the other cases the Superior Court relied on in holding the application of a statute of repose is a question of fact are distinguishable, as they involved individualized factual assessments regarding specific parties' acts, which inquiry is absent here.
(continued…)

Amici curiae Pennsylvania Municipal Authorities Association, Allegheny County Sanitary Authority, and National Association of Clean Water Agencies cite the long-standing history of biosolids recycling on farms and its comprehensive regulation by the EPA and the PaDEP, contending the practice is environmentally and economically sound; the regulations ensure protection of public health and the environment. Amici emphasize Hilltop Farms was in compliance with both federal and state regulations related to biosolids application on land, and acknowledge although odors cannot be completely eliminated, the regulations' required practices reduce them. Thus, amici contend, land application of biosolids is a "normal agricultural operation" within the meaning of the RTFA, and the Superior Court erred in failing to consider the RTFA's broad definition of the term. Amici contend, as others have, that McConnaughey is inapposite, as the instant matter involves a legal dispute over whether an activity falls under a statutory term. Rather, amici argue Commonwealth v. McKetta, 364 A.2d 1350, 1351 (Pa. 1976) (explaining determination regarding whether Ritalin constitutes "dangerous drug" under Drug, Device and Cosmetic Act was question of law), is analogous. Amici assert having juries determine whether land application of biosolids is a "normal agricultural operation" on a case-by-case basis will allow laypersons, not regulatory agencies, to determine how, when, and where biosolids can be applied — a technically complex determination that varies seasonally, depending on the crops' and soil's needs. Amici argue the Superior Court's decision eviscerates the RTFA's protections and results in uncertainty and extra expense for water treatment facilities and farmers; in turn, amici argue, this will result in decreased use of biosolids recycling and increased use of landfilling.

Amici curiae Pennsylvania Farm Bureau and PennAg Industries Association focus on the policy considerations supporting appellants' position, noting "the highly uncertain and volatile natural and economic impediments to financial viability" for farmers was the impetus behind enactment of many statutes protecting farming, including the RTFA. Amici Curiae Pennsylvania Farm Bureau and PennAg Industries Association's Brief in Support of Appellants, at 8. Amici argue the RTFA, along with other legislation such as the Agricultural Area Security Act, NMA, Domestic Animal Act, Pesticide Control Act of 1974, recodification of the Seed Act, Commercial Manure Hauler and Broker Certification Act, and the amendments to the Municipalities Planning Act under Act 68 of 2000, establish "a prevailing policy to protect farmers' need and ability to adapt their farms through modification and use of accepted farming practices … without unreasonable legal intrusion by local governments and neighbors." Id., at 9. Amici emphasize such legislation provides a meaningful degree of legal certainty, uniformity, and protection, which would be undermined if the interpretation of definitions such as "normal agricultural operation" were left to juries rather than courts. Amici contend assigning juries this question "is much more likely to provoke parochial, arbitrary and inconsistent determinations than assignment of the question to courts, thwarting the policy objectives (continued…)

Appellees argue § 954(a) is not a jurisdictional statute of repose, but rather is a statute of limitations, as indicated in its title. See 3 P.S. § 954 ("Limitation on public nuisances."). Appellees reason the statute does not entirely extinguish a cause of action for nuisance against a farm after the one-year period expires, as would a statute of repose; a nuisance claim may still be brought after the period expires if the conditions constituting the nuisance have not "existed substantially unchanged" since the farm's established date of operation and are not "normal agricultural operations." Thus, appellees claim § 954(a) is a statute of limitations, limiting the time within and circumstances under which a nuisance claim can be brought against a farm, and, as such, its applicability is a question of fact for a jury.

Appellees do not dispute the Superior Court majority's conclusion that the first requirement for a nuisance action to be barred by § 954(a) was met; the "agricultural operation" at issue is Hilltop Farms, and its "established date of operation" is 1986, more than one year before their action was brought. They focus on the latter two requirements, contending the "conditions … constituting the basis for the nuisance action," which are the odors resulting from the application of biosolids, have not "existed substantially unchanged since the established date of operation," i.e., 1986, and the conditions are not "normal agricultural operations."

Regarding the second requirement, appellees agree with the majority's holding that the relevant "conditions" were not simply the use of biosolids, but rather their use in a manner that resulted in extremely foul odors and health concerns. Appellees contend

---

(…continued)
advanced in the [RTFA] …." Id., at 10. Instead, amici assert, the analysis of whether an activity fits within the definition of "normal agricultural operation" should be based on consideration of the statutory language, legislative intent, and legal precedent, which is within the province of the courts.

the use of malodorous biosolids constituted a substantial change; however, they assert the court erroneously held, even if this constituted a substantial change, the one-year period was reset on the date of the change. Appellees argue the plain language of § 954(a)'s "substantial change" exception does not suggest the one-year period resets when there is a substantial change. They further argue Horne, on which the Superior Court relied to support its finding of a reset provision, is distinguishable because it involved the latter portion of § 954(a), which pertains to expansion or alteration of physical facilities and is not implicated here.

With respect to the third requirement, appellees contend the determination of whether a condition is a "normal agricultural operation" must be made on a case-by-case, not categorical, basis. They argue the phrase "conditions … complained of" requires an examination of the particular activity at issue, in the context of the circumstances in which it occurs; therefore, the question is not whether the application of biosolids, in general, is normal within the agriculture industry, but rather, whether the application of biosolids at Hilltop Farms and the resulting odor was normal. Thus, appellees claim, a jury, not a court, must make this fact-specific determination. They contend "this case raises the same caliber of case-specific factual issue that this Court in McConnaughey decided was inappropriate prior to trial[,]" Appellees' Brief, at 55, and cite decisions from other state courts holding the application of similar Right-to-Farm legislation in particular cases raised disputed factual issues that could not be summarily resolved, see id., at 57-58 (citing Reeves v. Hooton, 2013 W.L. 4680529 (Tex. App. 2013); Wyatt v. Sussex Surry, LLC, 74 Va. Cir. 302, 2007 W.L. 5969399 (Va. Surry Cnty. Ct. 2007); Trosclair v. Matrana's Produce, Inc., 717 So. 2d 1257, 1259 (La. Ct. App. 1998)). Finally, appellees claim the undisputed evidence shows the manner in which the biosolids were applied here did not conform to the EPA's and Synagro's recommended procedures and was

inconsistent with industry practices for odor management; therefore, the application of biosolids at Hilltop Farms was not a "normal agricultural operation."

Thus, appellees claim the requirements for application of § 954(a)'s one-year filing period were not met, and their nuisance action was timely under the general two-year statute of limitations. See 42 Pa.C.S. § 5524. Accordingly, they ask us to affirm the Superior Court's decision that summary judgment was improper, reverse its ruling that the RTFA's one-year period for nuisance actions resets when the conditions complained of are a substantial change in operations, and remand the case for trial.[16]

## Discussion

### A. Whether the trial court or the jury determines the applicability of § 954(a) of the RTFA.

We first address the parties' contentions concerning the character of § 954(a). Appellants contend the statute is a jurisdictional statute of repose; appellees contend it is

---

[16] Amici curiae Paul Solomon, Earl Shuckman, and Joseph Newberger, who served as township supervisors during the time the biosolids were used at Hilltop Farms, argue in support of appellees that § 954(a) of the RTFA is an affirmative defense, not a jurisdictional bar. Amici contend because the statute defines the criteria for its application in general terms, the inquiry regarding whether it applies is a mixed question of law and fact, to be determined by a jury; furthermore, there are multiple factual disputes concerning the manner in which the biosolids were applied here, also requiring resolution by a jury. They reiterate appellees' position that the use of biosolids on Hilltop Farms was a substantial change, that whether a practice is a "normal agricultural operation" is a question of fact to be addressed according to the specifics of each case, and that the use of biosolids here was not a "normal agricultural operation."

Amicus curiae Pennsylvania Association for Justice also argues in support of appellees that § 954(a) is not a statute of repose — and even if it is, its applicability is not automatically a question of law, as the applicability is conditioned upon the existence of a "normal agricultural operation." Amicus contends there was a material issue of fact regarding whether appellants' use of biosolids constituted a "normal agricultural operation"; thus, the Superior Court properly reversed the grant of summary judgment.

a statute of limitations.   In <u>Abrams v. Pneumo Abex Corp.</u>, 981 A.2d 198 (Pa. 2009), we explained the difference between these two classifications:

> A statute of repose is defined as a "statute barring any suit that is brought after a specified time since the defendant acted (such as by designing or manufacturing a product), even if this period ends before the plaintiff has suffered a resulting injury."   Black's Law Dictionary 1451 (8th ed. 2004). Thus,
>
>> A statute of repose … limits the time within which an action may be brought and is not related to the accrual of any cause of action; the injury need not have occurred, much less have been discovered.   Unlike an ordinary statute of limitations which begins running upon accrual of the claim, the period contained in a statute of repose begins when a specific event occurs, regardless of whether a cause of action has accrued or whether any injury has resulted.
>
> City of McKeesport v. Workers' Compensation Appeal Board (Miletti), 560 Pa. 413, 421, 746 A.2d 87, 91 (2000) (citations and emphasis omitted). While a statute of limitations merely bars a party's right to a remedy, a statute of repose completely abolishes and eliminates a party's cause of action.   Noll v. Harrisburg Area YMCA, 537 Pa. 274, 281, 643 A.2d 81, 84 (1994).

<u>Abrams</u>, at 211.

Section 954(a) permits a nuisance action to be brought within one year after a certain event occurs,[17] <u>i.e.</u>, after the defendant has acted, regardless of when the harm is alleged to have occurred.   Therefore, although the section is titled "<u>Limitation</u> on public

---

[17]  The parties do not agree whether "an agricultural operation which has lawfully been in operation for one year" refers to the <u>farm</u> itself or to the <u>activity</u> conducted on the farm. They dispute whether the one-year period runs from the start of a particular farming practice (the "agricultural operation" being the practice) or from the time a substantial change in such practice occurs (the "agricultural operation" being the farm).   These varying interpretations do not affect the "repose vs. limitations" analysis, and, as discussed <u>infra</u>, do not affect the outcome here.

nuisances," 3 P.S. § 954 (emphasis added), in essence, it operates as a statute of repose and is thus jurisdictional, see Cozzone v. Workers' Comp. Appeal Bd. (Pa Mun./E. Goshen Twp.), 73 A.3d 526, 535 (Pa. 2013) (stating issue of proper construction of statute of repose in Workers' Compensation Act presents pure question of law); McDevitt v. Workmen's Comp. Appeal Bd. (Ron Davidson Chevrolet), 525 A.2d 1252, 1253 & n.4 (Pa. 1987) (noting issue of whether claim was timely filed under Workers' Compensation Act's statute of repose was jurisdictional and need not be pled as affirmative defense); see also Smith v. Workmen's Comp. Appeal Bd. (Concept Planners & Designers), 670 A.2d 1146, 1148 (Pa. 1996) (distinguishing McDevitt as involving statute of repose, which is jurisdictional).  As jurisdictional issues are questions of law, see MCI Worldcom, Inc. v. Pa. Pub. Util. Comm'n, 844 A.2d 1239, 1246 n.3 (Pa. 2004), which are within the province of the court, § 954(a)'s applicability was a question for the trial court, not the jury.

Accordingly, we agree with the Superior Court's holding that, generally, statutes of repose are jurisdictional and their scope is a question of law for courts to determine.  See Gilbert, at 49 (citing Smith, at 1148-49).  We also acknowledge, as the Superior Court did, that there may be cases in which a statute of repose's applicability turns on resolution of factual issues.  In such cases, the facts relevant to jurisdiction are so intertwined with those relating to the merits of the action, the jurisdictional determination will necessarily involve fact finding.  This is not such a case, however, and we agree with the Superior Court dissent that the majority conflated the standard for summary judgment (whether there were material factual issues pertaining to the merits of appellees' nuisance claim) with that for applicability of the statute of repose (whether the practice appellants engaged in fit within the definition of "normal agricultural operation").  See id., at 53.

Here, the only question was whether the application of biosolids is a "normal agricultural operation"; there was no pertinent question regarding the character of the

substance in this specific case or appellants' use of it at Hilltop Farms. There was no individualized assessment to be made; the inquiry regarding whether appellants' application of biosolids conformed to accepted industry standards and best practices goes to the merits of the nuisance action — an issue not reached if the action is barred by the statute of repose. The Superior Court failed to recognize this distinction, and the cases it relied upon are distinguishable; in those cases, material issues of fact pertaining to the applicability of a statute of repose remained undiscovered or contested, precluding summary judgment.

In McConnaughey, the defendant — the manufacturer of roof trusses used in the construction of a barn that collapsed — sought protection under a 12-year statute of repose covering persons "performing or furnishing the design, planning, supervision or observation of construction, or construction of any improvement to real property …." 42 Pa.C.S. § 5536. This Court reversed the grant of summary judgment in the defendant's favor, noting the statute was enacted to protect builders, not actors who simply manufactured or supplied a product later incorporated into a construction project. McConnaughey, at 1334 & n.4. Thus, the crucial inquiry was whether the defendant "'furnished construction' or merely 'furnished supplies' to be used in construction." Id., at 1335. Because the facts concerning the defendant's role in the project were in dispute, we held the grant of summary judgment was inappropriate. Id.

Pridgen involved a deadly plane crash, after which several defendant airplane-engine-part manufacturers moved for summary judgment based on the protection of the 18-year statute of repose. See Pridgen, at 1168 n.2 (quoting 49 U.S.C.A. § 40101, Note). The statute provided an exception to its applicability where the defendant had made material misrepresentations to the Federal Aviation Administration (FAA). Id., at 1169 n.3 (quoting 49 U.S.C.A. § 40101, Note). Because there was a

dispute regarding whether the defendants misrepresented or fraudulently withheld information from the FAA, both the trial court and Superior Court held a material issue of fact existed regarding the statute of repose's applicability, precluding the entry of summary judgment. Id., at 1170, 1172.

Stewart also involved a fatal plane crash and the exception to the statute of repose. Additionally, there was a dispute regarding whether the defendants made misrepresentations to the FAA; therefore, the trial court and Superior Court held a material question of fact remained concerning the application of the statute of repose, and summary judgment was not warranted. Stewart, at 270, 277.

In E. Brunswick, discussed supra, Act 38 directed the Attorney General to seek expert opinions regarding what constituted a "normal agricultural operation" within the meaning of § 952 of the RTFA; thus, there was fact finding inherent in the application of Act 38. Additionally, there was no evidentiary record on which to make the factual finding that sewage sludge application fell within § 952's definition; accordingly, the Commonwealth Court held because the answer to this question was not clear, summary judgment was inappropriate. E. Brunswick, at 1115-16.

Here, the necessary facts are undisputed and of record. These facts include the timing and quantity of appellants' application of biosolids, the responsive actions by appellees and the timing of those actions, the regulatory oversight of appellants' biosolids application, and the history and extent of biosolids usage in Pennsylvania's farming industry. Unlike the foregoing cases, neither party's conduct is unknown or in dispute. Rather, the only question is whether appellants meet the statutory requirements necessary to avail themselves of the RTFA's statute of repose. This question does not involve fact finding; it involves the application of a statute's definition to the record's facts.

It is well settled that determining whether an activity, entity, or object falls within the meaning of a statutory definition is a matter of statutory interpretation, and thus is a question of law for the court to decide. See, e.g., Meyer v. Cmty. Coll. of Beaver County, 93 A.3d 806, 812-13 (Pa. 2014) (stating whether political subdivision agency is "person," as defined by Pennsylvania Unfair Trade Practices and Consumer Protection Law, is matter of statutory interpretation and, therefore, "a pure question of law"); Glatfelter Pulpwood Co. v. Commonwealth, 61 A.3d 993, 998 (Pa. 2013) (stating whether particular out-of-state timber sale constitutes "business income," as defined by Pennsylvania's Tax Reform Code of 1971, is question of law); Dechert LLP v. Commonwealth, 998 A.2d 575, 579 (Pa. 2010) (stating whether canned computer software constitutes "tangible personal property," within definition provided by Pennsylvania Tax Reform Code of 1971, "is an issue of statutory construction, which is a pure question of law"); E.D.B. ex rel. D.B. v. Clair, 987 A.2d 681, 683-84 (Pa. 2009) (stating whether minor child qualifies as "beneficiary" of medical assistance, as defined by Pennsylvania Fraud and Abuse Control Act of 1980, is question of law); Rendell v. Pa. State Ethics Comm'n, 983 A.2d 708, 712-13 (Pa. 2009) (stating whether non-profit corporation constitutes "business," within definition provided by § 1102 of Pennsylvania's Public Official and Employee Ethics Act, is issue of "statutory interpretation [and] therefore a question of law"); McKetta, at 1351 (stating whether drug is "dangerous drug," as defined by Drug, Device and Cosmetic Act, was question of law). Accordingly, the determination of whether § 954(a) applied in the instant matter was a question of law for the trial court.

This conclusion is consistent with the legislative intent underlying the RTFA, which states:

§ 951.  Legislative policy

It is the declared policy of the Commonwealth to conserve and protect and encourage the development and improvement of its agricultural land for the production of food and other agricultural products.   When nonagricultural land uses extend into agricultural areas, agricultural operations often become the subject of nuisance suits and ordinances.   As a result, agricultural operations are sometimes forced to cease operations.   Many others are discouraged from making investments in farm improvements.   <u>It is the purpose of this act to reduce the loss to the Commonwealth of its agricultural resources by limiting the circumstances under which agricultural operations may be the subject matter of nuisance suits and ordinances.</u>

3 P.S. § 951 (emphasis added).   The RTFA is actually titled, "PROTECTION OF AGRICULTURAL OPERATIONS FROM NUISANCE SUITS AND ORDINANCES."  3 P.S. Ch. 14B, §§ 951-957.   This aim cannot be achieved by permitting the applicability of the RTFA's statute of repose to be dependent on an idiosyncratic determination of a farming practice's "normality" as perceived by a jury in a specific case.   How a practice is conducted and whether it meets industry standards and regulations are questions pertaining to the merits of the nuisance action itself, once the court has determined such action is not barred by § 954(a); however, the inquiry under § 954(a) — whether an activity is a "normal agricultural operation" — is a categorical inquiry for the court. Otherwise, agricultural practices would be subject to nuisance suits based on varying local perceptions of what constitutes a "normal agricultural operation," as parochial opinion differs from jury to jury and juror to juror.   What is common in one area may be foreign to another.   Having courts apply the RTFA's definitions achieves the meaningful degree of legal certainty, uniformity, and consistency that the RTFA was intended to provide to farms.   Thus, we hold the trial court was within its province in determining § 954(a)'s applicability, and the Superior Court erred in concluding otherwise.

**B. Whether land application of biosolids is a "normal agricultural operation" pursuant to § 952 of the RTFA.**

We now must examine the propriety of the trial court's conclusion that land application of biosolids is a "normal agricultural operation" within the meaning of § 952, and assess whether appellants met the other requirements in § 954(a)'s statute of repose. Again, resolution of these inquiries requires us to engage in statutory interpretation, in which our standard of review is <u>de novo</u> and our scope of review is plenary. <u>Bowling</u>, at 466.

In interpreting § 954(a), we are mindful that:

The object of statutory construction is to ascertain and effectuate the General Assembly's intent. The plain language of a statute is, as a general rule, the best indicator of such legislative intent. Bd. of Revision of Taxes[ v. City of Philadelphia], 4 A.3d[ 610,] 622 [(Pa. 2010)] (citing 1 Pa.C.S. § 1921(a)). This general rule is subject to several important qualifications, including the precept that the General Assembly "does not intend a result that is absurd, impossible of execution, or unreasonable." Commonwealth v. Shiffler, 583 Pa. 478, 879 A.2d 185, 189-90 (Pa. 2005) (alternative construction of seemingly clear mandatory sentencing provision warranted to avoid absurd incongruity with graduated sentencing scheme) (citing 1 Pa.C.S. § 1922(1), (2)). Equally favored presumptions are that the General Assembly does not intend to violate the Constitution of the Commonwealth, and that it "intends to favor the public interest as against any private interest." 1 Pa.C.S. § 1922(3), (5). We may look beyond the language of the statute if the plain meaning would lead to such results.

Similarly, if the words of a statute are not explicit but are unclear or ambiguous, we resort to considerations other than the plain language to discern legislative intent. Commonwealth v. Garzone, 613 Pa. 481, 34 A.3d 67, 75 (Pa. 2012) (citing 1 Pa.C.S. § 1922; Commonwealth v. Diodoro, 601 Pa. 6, 970 A.2d 1100, 1106 (Pa. 2009)). Among the matters we may consider are: the occasion and necessity for the statute; the circumstances under which the statute was enacted; the mischief to be remedied; the object to be attained; the consequences of a particular interpretation; the contemporaneous legislative history; and the legislative and administrative interpretations of such statute. 1 Pa.C.S. § 1921(c).

<u>Mercury Trucking, Inc. v. Pa. Pub. Util. Comm'n</u>, 55 A.3d 1056, 1067-68 (Pa. 2012).

Turning to the plain language of § 954(a), we note, as the Superior Court observed, there are three key requirements for the statute of repose to bar a nuisance action: (1) the agricultural operation against which the action is brought must have lawfully been in operation for at least a year prior to the filing of the action; (2) the conditions or circumstances that are the basis for the action must have existed substantially unchanged since the established date of operation; and (3) the conditions or circumstances are normal agricultural operations as defined in § 952 of the RTFA. <u>See</u> 3 P.S. §§ 952, 954(a).

The trial court concluded the "agricultural operation" in the first requirement refers to the farm itself, not to the activities conducted on the farm, which are the "normal agricultural operations" referenced in the third requirement. Trial Court Opinion, 12/31/12, at 18-20. As the farm itself had existed since 1986, many years before the nuisance action was filed, the court concluded the first requirement was met. The trial court held the second and third requirements were met because the application of fertilizer was a normal agricultural operation that existed substantially unchanged since the farm began. <u>Id.</u>

In contrast, the Superior Court did not definitively rule on whether the "agricultural operation" in the first requirement was the farm or the practice complained of, holding the requirement was met, either way. The court likewise did not rule on whether the application of biosolids was a substantial change, holding such determination was unnecessary because the one-year period resets when such change occurs, allowing a nuisance action to be brought within one year from the date the objectionable practice began; as appellees' action was not filed until two years after the biosolids application

began, the second requirement for the bar to apply was met. The Superior Court differed with the trial court's conclusion that biosolids use is a "normal agricultural operation," concluding this determination was a jury question. See Gilbert, at 45, 50.

We agree with the Superior Court's reasoning regarding the first two requirements. Whether "agricultural operation" refers to the farm or to the farming process, § 954(a)'s one-year requirement is met here, as appellees' action was not filed until 2008, well beyond the one-year period. See id., at 44. Furthermore, even if the change to biosolids was a substantial change from prior operations, such change occurred more than two years prior to appellees' suit, rendering the suit untimely. See id., at 45.[18]

Thus, it is the third requirement for application of the statute of repose that is dispositive. Considering the question whether the conditions or circumstances on which the action is based are "normal agricultural operations," we disagree with the Superior Court's conclusion that there was a material issue of fact concerning whether appellants' use of biosolids met this requirement. See Gilbert, at 50-51. As discussed supra, the inquiry under this prong is a broad one, focusing on the practice in general, not on whether the defendant in this particular instance conducted the practice in accordance with accepted industry standards and regulations; the latter, individualized inquiry goes to the underlying merits of the nuisance action. Moreover, unlike the narrow class of cases where more fact finding is necessary to determine a statute of repose's applicability, see

---

[18] We likewise agree with the Superior Court's rationale that § 954(a)'s one-year period resets after a substantial change; to conclude the statute of repose is eliminated after a substantial change, as appellees argued below, would frustrate the legislative policy behind the RTFA of limiting the circumstances under which farms can be sued for nuisance and would have a chilling effect on the implementation of advances in farming practices. See id., at 46; Schiffler, at 189-90 (General Assembly does not intend result that is absurd, impossible, or unreasonable).

McConnaughey; Pridgen; Stewart; E. Brunswick, there is a well-developed record in this case concerning the normalcy of using biosolids as fertilizer. Reviewing the record concerning biosolids' history, related statutes and regulations, case law, and executive agencies' views, we find support for the trial court's conclusion that the use of biosolids as fertilizer falls within the definition of "normal agricultural operation," as set forth in § 952 of the RTFA:

> "Normal agricultural operation." The <u>activities, practices, equipment and procedures that farmers adopt, use or engage</u> in the production and preparation for market of poultry, livestock and their products and <u>in the production, harvesting and preparation for market use of agricultural,</u> agronomic, horticultural, silvicultural and aquacultural <u>crops</u> and commodities ….

> \*     \*     \*

> The term includes <u>new activities, practices, equipment and procedures consistent with technological development within the agricultural industry</u>. Use of equipment shall include machinery designed and used for agricultural operations, including, but not limited to, crop dryers, feed grinders, saw mills, hammer mills, refrigeration equipment, bins and related equipment used to store or prepare crops for marketing and those items of agricultural equipment and machinery defined by … the Farm Safety and Occupational Health Act. Custom work shall be considered a normal farming practice.

3 P.S. § 952 (emphasis added).

As previously noted, the legislative policy underlying the RTFA is plainly expressed in § 951: to protect Pennsylvania's agricultural resources by limiting the circumstances under which farms may be sued for nuisance. This purpose cannot be achieved unless the definition of "normal agricultural operation" is read expansively, taking into account new developments in the farming industry. The fact that biosolids use is not specifically mentioned in the RTFA's definition is not determinative, as the

definition is broadly drafted, aimed at protecting farms now and in the future; enumerating specific activities would render the definition outdated as farming technology progresses. The legislative goal is to protect and encourage farming innovation, as evidenced by amendment of the definition of "normal agricultural operation" in 1998. See Act of May 15, 1998, P.L. 441, No. 58, § 1. Prior to 1998, the RTFA offered protection to farming practices that were "customary and generally accepted." Act of June 12, 1996, P.L. 336, No. 52, § 1. As appellants note, "[t]he amendment deleted this limiting language and increased the scope of protected activities to 'include[ ] new activities, practices, equipment and procedures consistent with technological development within the agricultural industry[,]'" Appellants' Brief, at 36 (quoting Act of May 15, 1998, P.L. 441, No. 58, § 1), thus encompassing as many farming methods as possible, including those that do not yet exist. Accordingly, interpreting "normal agricultural operation" to include technological advancement in fertilizing methods, such as the use of biosolids, is consonant with the RTFA's purpose.

The statistics and facts relating to the history of biosolids land-use also support the conclusion that the use of biosolids as fertilizer is a "normal agricultural operation." We are cognizant that the RTFA sets no quantitative threshold regarding how many farms must employ a practice for it to be considered "normal"; however, as the trial court and Superior Court observed, "'over the past 20 years, [PaDEP] has permitted approximately 1,500 sites, including farms, for the application of biosolids, and more than 700 of those sites had active permits as of 2010.'" Gilbert, at 49 (quoting Trial Court Opinion, 12/28/12, at 10-11). Notably, amicus City of Philadelphia's history of producing biosolids for agricultural use illustrates the practice's acceptance: the City has engaged in such production for over 30 years; since 1990, over one-third of its biosolids have been used on farms in Pennsylvania and elsewhere; since 2008, the City has recycled 100% of its

biosolids, with half of them being applied to land; and in 2014, 15,524 dry tons of the City's biosolids were used on Pennsylvania farms. See Amicus Curiae City of Philadelphia's Brief in Support of Appellants, at 2-3, 5-6. In the past 15 years, the PaDEP has approved biosolids use on over 70 sites in York County, where Hilltop Farms is located. Trial Court Opinion, 12/31/12, at 11. Thus, biosolids have been used as fertilizer for decades in Pennsylvania. See Appendix to Defendants' Motion for Summary Judgment, Vol. III, Ex. HH, "Penn State College of Agricultural Sciences, Cooperative Extension Fact Sheet: A Plain English Tour of the Regulations," at 1 (stating land application of sewage sludge was first regulated in Pennsylvania in 1977).

Nationwide, biosolids application has substantially increased, more than doubling since 1976. See Appendix to Defendants' Motion for Summary Judgment, Vol. III, Ex. SS, EPA Biosolids Management Handbook, Section 2.6-3 (1999). Over half of the biosolids produced in the United States are used for land application. See id. ("In 1995, 54% of all biosolids produced in the United States were beneficially used for land application."); Appendix to Defendants' Motion for Summary Judgment, Vol. III, Ex. VV, National Research Council, "Biosolids Applied to Land: Advancing Standards and Practices," at 1 (2002) ("Approximately 5.6 million dry tons of sewage sludge are used or disposed of annually in the United States; approximately 60% of that is used for land application."); Appendix to Defendants' Motion for Summary Judgment, Vol. III, Ex. BB, Excerpt of EPA Process Design Manual, "Land Application of Sewage Sludge and Domestic Septage," at 1 (1983) (stating 33% of sewage sludge generated annually in United States is applied to land; 67% of that amount is applied on agricultural lands). Biosolids application is influenced by varying nutrient needs of crops from season-to-season, the weather, and storage and transportation logistics; thus, the amount and time of year of the application varies monthly, seasonally, and annually.

See Appendix to Defendants' Motion for Summary Judgment, Vol. III, Ex. BB, Excerpt of EPA Process Design Manual, "Land Application of Sewage Sludge and Domestic Septage," at 5, § 2.2.1 (1983) (describing how sewage sludge application to farmland must be at rate equal to or less than "agronomic rate" concerning nitrogen amount). Such variance, as experienced in the instant matter, does not make the practice any less "normal." Additionally, the manner in which biosolids are applied at a particular site is not determinative of the practice's normalcy, in general. Thus, we reject appellees' contention that the allegedly improper manner in which the biosolids were applied here determines whether this is a "normal agricultural operation"; the manner of application and the resulting harm go to the underlying merits of the nuisance claim, but the question of law for the trial court was whether application of biosolids, generally, is a normal operation. Here, the facts of record concerning land use of biosolids support the conclusion that such use is a "normal agricultural operation" within the RTFA's definition.

Furthermore, although the RTFA is silent regarding the effect of governmental regulation on a practice's being considered a "normal agricultural operation," we disagree with the Superior Court's conclusion that such regulation should not have any weight in making this assessment. The application of biosolids to farmland has been closely regulated by the PaDEP for 30 years, and the RTFA is part of a comprehensive regulatory framework for biosolids use. We cannot ignore the existence of other statutes, regulations, and case law that classify biosolids use on farmland as an ordinary farming practice to be encouraged. The RTFA should not be considered in isolation, but in the context of the elaborate regulatory framework for biosolids use in which it exists. Within this framework, both the SWMA and Act 38 include the land application of biosolids in their respective definitions of "normal farming operations" and "normal agricultural

operation."[19]  See 35 P.S. § 6018.103 (defining "normal farming operations" as "the customary and generally accepted activities, practices and procedures that farms adopt, use, or engage in year after year … in the production, harvesting and preparation for market of agricultural … crops[,]" which "includes the agricultural utilization of septic tank cleanings and sewage sludges which are generated off-site") (emphasis added); 3 Pa.C.S. §§ 312, 313(c)(2) (adopting RTFA's definition of "normal agricultural operation" and providing nothing in Act 38's provisions shall be construed to diminish, expand, or otherwise affect local governments' authority to regulate, control, or permit "land application of class A or B biosolids") (emphasis added).  The Nutrient Management Act includes biosolids in its definition of "nutrient."  See id., § 503 (stating "nutrient" "includes, but is not limited to, livestock and poultry manures, compost as fertilizer, commercially manufactured chemical fertilizers, sewage sludge or combinations thereof") (emphasis added).  The PaDEP's regulations define "agricultural utilization" to include the use of biosolids as fertilizer.  See 25 Pa. Code § 271.1 (providing "agricultural utilization" includes "land application of sewage sludge for its plant nutrient value or as a soil conditioner") (emphasis added); see also Hempfield Twp. v. Hapchuk, 620 A.2d 668, 672 (Pa. Cmwlth. 1993) (holding application of sewage sludge for farming purposes comported with prior, non-conforming agricultural use of land parcel, and noting SWMA includes use of sewage sludge as fertilizer in definition of "normal farming operations").  Thus, a review of related authority concerning biosolids land use leads to the conclusion this is and has been an accepted farming practice in Pennsylvania.

---

[19] We note, contrary to the Commonwealth Court's statement in E. Brunswick, on which the Superior Court majority relied, Act 38 mentions land application of biosolids in § 313(c)(2).  See E. Brunswick, at 1115 ("[N]owhere in Act 38 is there any mention of sewage sludge or its application to land.").

Finally, we note the Attorney General of Pennsylvania, the Pennsylvania Department of Agriculture, and the PaDEP, which are involved in enforcement of the RTFA and regulation of biosolids use, hold the view that biosolids land application is a "normal agricultural operation" within the meaning of § 952. See Tritt v. Cortes, 851 A.2d 903, 905 (Pa. 2004) (interpretation of statute by those charged with its administration and enforcement is entitled to deference; such consideration most appropriately pertains to circumstances where provision is not explicit or is ambiguous). These agencies' experience and expertise in dealing with the regulation of biosolids use and enforcement of the RTFA also supports a finding that the land application of biosolids is an accepted, well-regulated farming practice.

Accordingly, we conclude the record clearly demonstrates there is no genuine issue of material fact that biosolids land use is a "normal agricultural operation" within the meaning of § 952 of the RTFA. The trial court, as the proper arbiter for determining § 954(a)'s applicability, correctly concluded appellee's nuisance claims were barred by the statute of repose, and appellants were entitled to summary judgment as a matter of law on the nuisance claims. The portion of the Superior Court's order reversing the grant of summary judgment on these claims is reversed, and the matter is remanded for reinstatement of summary judgment in favor of appellants. In all other respects, the order of the Superior Court is affirmed.

Order reversed in part; affirmed in part; case remanded. Jurisdiction relinquished.

Mr. Chief Justice Saylor, Mr. Justice Baer, Madame Justice Todd and Mr. Justice Stevens join the opinion.

Mr. Chief Justice Saylor files a concurring opinion in which Madame Justice Todd joins.